THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. TIMOTHY HAMPTON, Defendant-Appellant.

First District (3rd Division)   No. 1—98—0148

Opinion filed September 1, 1999.

Edward R. Vrdolyak, Ltd., of Chicago (Gustavo Munoz, of counsel), for appellant.

Richard A. Devine, State's Attorney, of Chicago (Renee Goldfarb, Marga-

ret J. Faustmann, and Bronwyn P. Sears, Assistant State's Attorneys, of counsel), for the People.

JUSTICE CERDA delivered the opinion of the court:

Defendant, Timothy Hampton, appeals from the denial of his motion to suppress evidence and from his convictions, after a jury trial, of possession of a controlled substance with intent to deliver (720 ILCS 570/401(a)(2)(C) (West 1994)), official misconduct (based on the possession offense) (720 ILCS 5/33—3(b) (West 1994)), and armed violence (720 ILCS 5/33A—2 (West 1994)).

We affirm the denial of the motion to suppress. We vacate the conviction for armed violence because the single physical act of possession of cocaine was the basis for the convictions for armed violence and drug possession. We reverse the conviction for official misconduct because defendant did not use his status as a police officer to commit the drug possession offense. We affirm the conviction for possession of a controlled substance with intent to deliver. We remand the cause for resentencing because defendant was given a combined sentence for the armed violence and drug possession convictions.

## Facts

The following summary of the evidence contains facts presented at the hearing on the motion to suppress and/or at the trial.

On March 8, 1996, at 10:40 p.m., Maywood police officer James Robinson received a dispatch to investigate an attempted armed robbery by a Hispanic man that had occurred recently at an apartment building on Third Avenue in Maywood. When Robinson arrived, defendant Hampton was the first to approach him. Defendant reported that someone tried to rob defendant's brother, later identified as Marlan Price, in the apartment building. Defendant gave a description of the alleged robber. Price then approached Robinson and also reported the robbery attempt.

Defendant walked away during Robinson's conversation with Price and went to one of the apartment building's entrances and frisked some men there. When Robinson came over to question what defendant was doing, defendant identified himself as a Chicago police officer, displaying a Chicago police department identification card, and said that the men in the entrance had been loitering. Defendant was not dressed in his uniform. According to Robinson's testimony, Price told Robinson that none of those men was the armed robber, but, according to defendant's testimony, Price pointed out a man named Fernando Casas as looking like the man who tried to rob him. After a conversation in which Robinson expressed concern to defendant over the danger of a police officer frisking five persons by himself, defen-

dant and Price left. Robinson never doubted that defendant was a Chicago police officer.

Maywood police sergeant Jesse Ingram arrived after defendant left. Ingram and Robinson questioned the men defendant had frisked. Fernando Casas was Hispanic but was known to the police officers and was released. The rest of the men were unable to produce satisfactory identification and agreed to go to the police station. Stanley Polk was one of those men. Polk presented a Chicago police badge to Ingram, saying that defendant had dropped it. It was later determined that the badge was indeed defendant's. One of the men asked Ingram to secure the front door of an apartment that he had left open. Ingram complied, entering the building from the rear. Sometime around the time that Ingram was in the building, Maywood police officer Aaron Wade arrived, and as he drove up, he saw a brown Cadillac leaving the area.

While Ingram was in the apartment building, Robinson and Wade saw a Cadillac, which possibly was brown, park on the street a little north of the building. At this point only a few minutes had elapsed since defendant had left. Robinson did not observe the car's driver commit any traffic violations, but Wade observed that the headlights were off. It was later determined that the car was registered to Polk.

Robinson could not see the occupants of the car when it first arrived. Price exited the car from the passenger's side and began walking toward the rear of the apartment building. Although Robinson recognized Price as the alleged victim, Robinson radioed to Ingram that someone was coming up the back and that someone was in the car. After Ingram emerged from the apartment building, he saw that the car's windows were tinted and, for the safety of the police officers, he drew his gun and ordered Price to lie down on the sidewalk.

Ingram wanted to see who remained in the car. Robinson and Wade, and eventually Ingram, went over to the car. As Robinson approached the car, he saw that the driver was defendant. Robinson positioned himself on the driver's side. Defendant testified that he identified himself to Ingram as a Chicago police officer when Ingram walked up to the car. Ingram, who was standing at the passenger's side, asked defendant to exit the car. Defendant testified that he complied with Ingram's request to exit. Defendant stated "It's me," but there was conflicting evidence whether he said this before or after he exited the car. According to Wade and Ingram, defendant did not immediately step out of the car. Ingram testified that defendant responded to the request by rolling down the window partially and saying, "It's me," and that he then asked defendant to step out again.

Ingram testified that, once defendant exited the car, Robinson identified defendant as the police officer that Robinson had spoken

about earlier. Robinson asked defendant if he had a weapon, but there was conflicting evidence as to whether that question was asked before or after defendant was asked to exit the car. Defendant answered that he did have a weapon and that it was on the front seat. Robinson testified that Wade, who was also standing next to the driver's side, entered the car through the passenger's side to retrieve the weapon after defendant exited the car.

Ingram testified that, after Wade entered the car, Wade stood back up and said, "There's drugs in here." At this point, Ingram felt that his "primary position" was "securing" defendant.

Wade testified that defendant had left the car door open and that, as Wade stood outside the driver's door, Wade shined a flashlight into the car. Wade testified that from outside the car he saw a brown plastic bag in the car and that he could see that inside the bag there was cocaine contained in four bags, with each bag being a little larger than a sandwich bag. Wade testified that he said to defendant that the contents looked like cocaine and that defendant responded, "That is what it is—Let me tell you about it." Wade testified that he entered the car after defendant said the contents were cocaine. Wade testified that a portion of the bag was sticking out in front of the armrest and that the gun was under the bag.

Defendant testified that it was not until after Wade had entered the car and had opened the bag that Wade said that the contents looked like cocaine.

Ingram testified that, once the drugs were found, defendant stated that he was working some type of tactical operation. Defendant was handcuffed once it was determined that the bag contained cocaine.

The motion to suppress was denied. The trial court noted in its oral ruling that the police were investigating a violent crime, that defendant was out of his jurisdiction, and that the police had a right to be concerned as they approached the car because of defendant's weapon. The trial court found that the police looked inside the car with a flashlight and saw the cocaine before entering the car.

Steven Beadle, an assistant State's Attorney, testified at trial that defendant gave him a statement, which he put in written form. The statement admitted defendant's participation in the plan to have Fernando Casas arrested for attempted armed robbery. The statement differed from defendant's testimony in that it recited that (1) defendant gave a description of Fernando when he called the police; (2) defendant gave his badge to someone else (because Fernando was in the hallway and he told that person to get everyone out of the hallway); and (3) defendant had seen the cocaine when the police were approaching the car, as he put his gun on the armrest. Defendant denied having made the second and third statements.

Jack Wilk, an assistant State's Attorney who spoke with defendant, testified at trial that defendant told him that (1) Polk was a drug dealer; (2) Polk promised defendant $3,000 for his participation; (3) defendant knew that cocaine was involved in the transaction, but cocaine was not supposed to be in the car; and (4) once defendant got in the car, he saw the cocaine and recognized it.

Chicago police sergeant Robert Kero testified that defendant was a Chicago police officer but was not working on the date in question. However, Chicago police officers are considered police officers 24 hours a day and are presumed to be on duty 24 hours a day. Chicago police officers are required to take proper police action 24 hours a day, which could include making an arrest. Although defendant was not required to carry his weapon when off duty, defendant was authorized to carry the weapon.

Robinson testified that the street value of 496.3 grams of cocaine was about $50,000 and that the purity of cocaine affected its street value.

When Robinson was asked what a street dealer could do with cocaine that was about 81% pure, defendant objected on the basis that the question was a hypothetical, was based on speculation, and was irrelevant. The trial court ruled that the evidence was probative because one of the charges was possession of a controlled substance with intent to deliver. Robinson testified that 81% pure cocaine was high quality and that a dealer could triple his money by cutting and doubling the cocaine. Robinson also testified that the amount retrieved from defendant would never be considered an amount for personal use but could be considered an amount for distribution and sale.

Gregory Bate, a forensic specialist with the Illinois State Police, testified that the total weight of the powder in the four bags was 496.3 grams. He performed tests on each bag and concluded that each bag contained cocaine.

Bate further testified that he performed a quantitative analysis on the first bag. Defendant objected on the basis that he had been provided no reports on the purity of the cocaine. The State asserted that there was a one-line report stating the purity of the cocaine was 81%. The trial court stated that the purity was "really somewhat remote as to the issues of this case" but granted defendant a few minutes to look at the report and to examine or talk to the expert. When Bate's testimony resumed, he testified that he tested only the first bag, that the purity of the cocaine in that bag was 81%, and that he had no idea of the purity of the cocaine in the other bags.

The State argued in part that defendant did not possess this cocaine for his own personal use but that the cocaine was going to be

broken down to be sold. Defendant on appeal complains of the following statements as incorrectly indicating that the entire amount of cocaine was 81% pure, although defendant did not object when the statements were made:

"You heard the chemist testify the weight was approximately 500 grams, clearly over 400, and it was 81 percent pure. That's important, because when a dope dealer gets a quantity of drugs 81 percent pure, that's a high quantity. He's not going to sell this to an individual when it's wrapped with 81 percent purety [*sic*]. He's going to make some more money. He's going to break it down, add other substances, wrap it up. And as the officer stated, this is $50,000, it could become $100,000, it could become $150,000 when it's distributed to individuals on the street."

Defendant was sentenced to 29 years' imprisonment for possession of a controlled substance with intent to deliver and for armed violence and to 5 years' imprisonment for official misconduct to be served concurrently.

## Motion to Suppress

Defendant first argues that the trial court erred in denying his motion to suppress because (1) the police could not lawfully detain defendant because they had no probable cause or reasonable, articulable suspicion that defendant, known to the officers as the brother of the victim, had committed a crime; and (2) defendant's status as a police officer did not strip him of his right to be free from unlawful searches and seizures, and the plain view doctrine does not apply where the initial intrusion into the plain view area is unlawful.

■ The trial court's ruling on a motion to suppress evidence is subject to reversal only if it is manifestly erroneous. *People v. Krueger*, 175 Ill. 2d 60, 64, 675 N.E.2d 604, 607 (1996). On review, we can consider the evidence at trial in considering the motion to suppress. *People v. Sims*, 167 Ill. 2d 483, 500, 658 N.E.2d 413 (1995).

■ Unreasonable searches and seizures are prohibited by the fourth amendment to the United States Constitution and by the Illinois Constitution. U.S. Const., amend. IV; Ill. Const. 1970, art. I, § 6. A seizure occurs when, by means of physical force as a show of authority, a person's freedom of movement is restrained. *United States v. Mendenhall*, 446 U.S. 544, 553, 64 L. Ed. 2d 497, 509, 100 S. Ct. 1870, 1877 (1980).

■ In *Terry v. Ohio*, 392 U.S. 1, 20 L. Ed. 2d 889, 88 S. Ct. 1868 (1968), where a police officer observed defendant's suspicious behavior and suspected that defendant was about to commit a crime, the Court upheld the officer's protective pat-down search, although the police officer lacked probable cause for arrest. The Court expressly declined to

decide whether an investigative seizure upon less than probable cause would be proper. *Terry*, 392 U.S. at 20 n.16, 20 L. Ed. 2d at 905 n.16, 88 S. Ct. at 1879 n.16.

In a later case, the Court permitted the investigative detention of suspects in a car. *United States v. Brignoni-Ponce*, 422 U.S. 873, 881-82, 45 L. Ed. 2d 607, 616-17, 95 S. Ct. 2574, 2580 (1975). The detention was based on a reasonable suspicion of illegal activity (aliens illegally entering the country near the Mexican border) and was for the purpose of questioning the car's occupants, including an explanation of suspicious circumstances. In another case after *Terry*, the Court permitted a *"Terry* stop" of a person who was suspected of a felony that had already been completed. *United States v. Hensley*, 469 U.S. 221, 228-29, 83 L. Ed. 2d 604, 611-12, 105 S. Ct. 675, 680 (1985).

■ Under Illinois statute, a police officer is authorized to temporarily question suspects, including a person who is suspected of an offense that has been completed:

"A peace officer *** may stop any person in a public place for a reasonable period of time when the officer reasonably infers from the circumstances that the person is committing, is about to commit or has committed an offense *** and may demand the name and address of the person and an explanation of his actions. Such detention and temporary questioning will be conducted in the vicinity of where the person was stopped." 725 ILCS 5/107—14 (West 1994).

Defendant was not a suspect in any crime but rather was a person who reported a crime committed against another. Because defendant reported the crime, the police may have believed that defendant was a witness to the crime. Defendant gave a description of the alleged robber when the police arrived. In the telephone call, he may also have given the police a description of the alleged robber, but defendant gave conflicting evidence on this point. At the very least, the record demonstrates that defendant conveyed to the police that he had some knowledge of the circumstances of the crime—whether firsthand or through communication with the alleged victim. We address the issue of whether the police could have lawfully detained defendant because he was a possible witness.

Illinois recognizes that under *Terry* there is a limited exception to the probable cause requirement permitting a police officer to briefly detain a person for investigatory purposes and, if necessary for safety, to search that person for weapons. *People v. Long*, 99 Ill. 2d 219, 227, 457 N.E.2d 1252 (1983). Thus the police, in investigating criminal activity, can briefly detain persons for questioning.

One treatise has expressed approval of the view that the power to

stop should be extended to potential witnesses, although in more narrowly circumscribed circumstances than the stopping of suspects. 4 W. LaFave, Search & Seizure § 9.2(b), at 24 (3d ed. 1996). The view was contained in the Model Code of Pre-Arraignment Procedure, which proposes the following circumstances that would permit the detention of potential witnesses and possibly others who could aid a criminal investigation:

"(i) The officer has reasonable cause to believe that a misdemeanor or felony, involving danger of forcible injury to persons or of appropriation of or danger to property, has just been committed near the place where he finds such person, and

(ii) the officer has reasonable cause to believe that such person has knowledge of material aid in the investigation of such crime, and

(iii) such action is reasonably necessary to obtain or verify the identification of such person, or to obtain an account of such crime." Model Code of Pre-Arraignment Procedure § 110.2(1)(b) (1975), quoted in 4 W. LaFave, Search & Seizure § 9.2(b), at 24 (3d ed. 1996).

LaFave notes that there have been cases (from other jurisdictions) that have permitted police officers to stop people who are potential witnesses. 4 W. LaFave, Search & Seizure § 9.2(b), at 25 n.30 (3d ed. 1996). *E.g., Baxter v. Arkansas*, 274 Ark. 539, 544, 626 S.W.2d 935, 937 (1982) (court upheld stop of defendant's vehicle in a deserted park near an armed-robbery scene, shortly after the crime, because it was likely that defendant would have seen the robbers); *Williamson v. United States*, 607 A.2d 471, 476-78 (D.C. App. 1992) (stop of vehicle upheld where police officer heard gunshots in course of investigating an assault and believed that vehicle's occupants were either participants in the shooting or witnesses); *State v. Shaffer*, 223 Kan. 244, 248, 574 P.2d 205, 208 (1977) (court upheld stop of vehicle driven by defendant, who was a former employee of the gas station where a murder occurred but who was not a suspect, as part of questioning of former employees).

■ The Maywood police officers initially could not have approached the car with the intention of speaking with defendant further about the reported crime because they did not know defendant was driving the car. The only reason expressly given for approaching the car was Ingram's concern for the safety of the police officers. But, after the police officers had approached the car, defendant was recognized, and at that point an investigatory detention of defendant was justified, even though the officers did not testify that they wished to question defendant.

An attempted armed robbery had recently taken place apparently in the vicinity of the apartment building; that crime involved danger of serious injury. The Maywood police officers knew that defendant had knowledge of the crime and could aid in the investigation of the crime. Although the Maywood police officers knew defendant's identity and could have attempted to reach him later by contacting the Chicago police department, the exigency of the recent alleged crime did not require them to wait and delay further investigation. We believe that the circumstances in this case are similar to the circumstances enumerated by the Model Code and those present in the cases from other jurisdictions cited above; the circumstances justified the temporary seizure of defendant.

We acknowledge that the police officers never commenced an interrogation of defendant about the attempted robbery: because they immediately required defendant to exit the car and because the cocaine was visible to the police, they discovered the cocaine upon defendant's exiting the car. We believe that ordering defendant out of the car was not an unreasonable action; the car was already stopped, and having defendant exit in order to speak with him would not have unduly lengthened a brief detention of a possible witness.

Whether defendant was asked about his weapon before or after exiting the car, we find that it was lawful for the police to ask about, and retrieve, the weapon. Where the officer making a *Terry* stop reasonably believes, based on specific, articulable facts, that his safety or the safety of others is in danger, the officer may also conduct a limited search of an individual for weapons. *Terry*, 392 U.S. at 27, 20 L. Ed. 2d at 909, 88 S. Ct. at 1883. Although there was no evidence that defendant had committed a crime, the police officers knew that defendant was a Chicago police officer and therefore could be armed, and they may have feared for their safety because of the odd circumstances in which one of the detained persons had been in possession of defendant's police badge.

The next issues are whether the shining of a flashlight into defendant's car constituted an unlawful search and whether the cocaine was in plain view.

■ The United States Supreme Court has held that a police officer does not conduct a search within the meaning of the fourth amendment when he shines his flashlight to illuminate the interior of a car; the use of artificial means to illuminate a darkened area does not constitute a search within the meaning of the amendment. *Texas v. Brown*, 460 U.S. 730, 739-40, 75 L. Ed. 2d 502, 512, 103 S. Ct. 1535, 1542 (1983). The rationale is that, because the general public can peer into the interior of the car, there is no reason why a police officer should be

precluded from observing what would be entirely visible to him as a private citizen. *Brown*, 460 U.S. at 740, 75 L. Ed. 2d at 512-13, 103 S. Ct. at 1542. The use of a flashlight in our case was therefore lawful.

■ Property in plain view can be lawfully seized if certain requirements are met. *Brown*, 460 U.S. at 736-37, 75 L. Ed. 2d at 510, 103 S. Ct. at 1540-41. Flashing a light into a validly stopped car satisfies the first requirement of the plain view doctrine: the police officer must lawfully make an "initial intrusion" or otherwise properly be in a position from which he can view a particular area. *Brown*, 460 U.S. at 741, 75 L. Ed. 2d at 513, 103 S. Ct. at 1542-43.

The other requirements of the plain view doctrine are that the officer must discover incriminating evidence inadvertently and that it must be immediately apparent to the officer that the items he observes may be evidence of a crime, contraband, or otherwise subject to seizure. *Brown*, 460 U.S. at 736-37, 75 L. Ed. 2d at 510, 103 S. Ct. at 1540-41. Defendant argues that the bag of drugs could not be in plain view because there was nothing suspicious about an ordinary grocery bag, but he ignores the uncontradicted testimony that the officer was able to see the drugs in the plastic bag. We hold that the cocaine was in plain view.

## Evidence of Purity of Cocaine

Defendant next argues that the trial court erred in allowing Bate's testimony about the purity of the cocaine where the State failed to comply with a discovery request for the results of scientific tests that was made 18 months before trial.

■ The issue was waived because defendant only generically raised in his posttrial motion the issue of the admission of improper evidence. *People v. Parchman*, 302 Ill. App. 3d 627, 632, 707 N.E.2d 88 (1998) (general and vague allegations in a posttrial motion are not sufficient to overcome waiver).

■ But we will review the issue under the plain error doctrine (134 Ill. 2d R. 615(a)) because the evidence of intent to deliver was closely balanced (*Parchman*, 302 Ill. App. 3d at 633). The purity of the cocaine is an important factor indicative of intent to deliver (see *People v. Robinson*, 167 Ill. 2d 397, 408, 657 N.E.2d 1020 (1995) (the factors that are indicative of intent to deliver are whether the quantity of controlled substance in defendant's possession is too large to be viewed as being for personal consumption; the high purity of the drug confiscated; the possession of weapons; the possession of large amounts of cash; the possession of police scanners, beepers, or cellular telephones; the possession of drug paraphernalia; and the manner in which the substance is packaged)). In this case, there was evidence of

only the following factors: (1) the amount (496.3 grams) was too large for personal use; (2) the cocaine in one of the bags was 81% pure; (3) although defendant was a police officer who was permitted to carry a gun, his intent may have been to use his weapon in connection with selling the cocaine; and (4) the cocaine was divided into four separate packages.

■ The sanction to be imposed under Supreme Court Rule 415 (134 Ill. 2d R. 415) for discovery violations was within the trial court's discretion. *People v. Morgan*, 112 Ill. 2d 111, 135, 92 N.E.2d 1303 (1986). The trial court properly granted defendant a sufficient opportunity to review the one-line report and to examine Bate about the purity results, which he did. Defendant does not assert that he could have challenged the evidence that 81% pure cocaine was high quality and that high-quality cocaine can be diluted to increase its value.

Furthermore, even if the court's ruling was in error, defendant was not sufficiently prejudiced because there was sufficient evidence that defendant possessed the cocaine with the intent to deliver. *People v. Cisewski*, 118 Ill. 2d 163, 172-73, 514 N.E.2d 970 (1987) (one of the factors to be considered in determining whether a new trial is warranted for a discovery violation is the closeness of the evidence).

Defendant also contends that, although only one bag of cocaine was tested for purity, the State implied in its closing argument that the entire amount of the cocaine was 81% pure and that therefore its total street value was $150,000. The issue is waived because defendant did not object at closing argument or in his posttrial motion (*People v. Enoch*, 122 Ill. 2d 176, 186, 522 N.E.2d 1124 (1988)), but we will address the issue under the plain error doctrine because of the importance of the factor of the cocaine's purity.

We do not find that the closing argument was prejudicial: the jury had evidence that only the first bag was tested for purity and that the total weight of the four bags was 496.3 grams.

## Evidence of Bulletproof Vest

■ Defendant next argues that the trial court erred in admitting evidence that Polk was wearing a bulletproof vest at the time of Polk's arrest because there was no evidence tying it to defendant.

Physical evidence is admissible provided there is proof to connect it with the defendant and the crime. *People v. Free*, 94 Ill. 2d 378, 415, 447 N.E.2d 218 (1983). We fail to see how the evidence of the vest tended to prove any of the charged offenses. Nevertheless, the error was harmless because defendant had the opportunity to establish through cross-examination of Sergeant Kero that there was no evidence to connect the vest with defendant. Defendant did in fact ad-

duce evidence that the vest's warranty had expired years before defendant became a police officer.

### Armed-Violence and Official-Misconduct Convictions

Defendant argues that (1) the conviction for armed violence should be vacated because convictions for armed violence and for possession with intent to deliver cannot stand where a single physical act of possession of the cocaine was the basis for both charges; and (2) a sentence should be imposed only upon the possession offense. *People v. Smith*, 258 Ill. App. 3d 261, 263-64, 630 N.E.2d 147 (1994). The State concedes, and we agree with defendant.

Defendant also argues that the convictions for armed violence and official misconduct were inconsistent because his possession of a weapon formed the basis of both convictions. We do not need to address this argument because we find that defendant's conviction of official misconduct was improper on the basis that defendant's possession of cocaine was not committed in his official capacity.

■ Defendant was charged with violating section 33—3(b) of the official-misconduct statute:

"A public officer or employee commits misconduct when, in his official capacity, he commits any of the following acts:

\*\*\*

(b) Knowingly performs an act which he knows he is forbidden by law to perform." 720 ILCS 5/33—3(b) (West 1994).

An act is performed in one's official capacity if it is accomplished by exploitation of his public position. *People v. Lynn*, 223 Ill. App. 3d 688, 691, 585 N.E.2d 1204 (1992) (because defendant's status as a prison employee was integral to the transaction in which defendant agreed to deliver cocaine to an inmate, defendant acted in his official capacity).

Not all actions of a police officer are done in his official capacity, even those performed while on duty. *People v. Steinmann*, 57 Ill. App. 3d 887, 897, 373 N.E.2d 757 (1978) (defendant police officer's sale of gun to other police officer was accomplished in defendant's individual capacity); see *People v. Webb*, 144 Ill. App. 3d 83, 87, 493 N.E.2d 1190 (1986) (perjury of police officer was committed as an individual); *People v. Jordan*, 15 Ill. App. 3d 672, 676, 304 N.E.2d 713 (1973) (money received by police officer on duty from an ambulance driver was not received in official capacity when there was no evidence that he accepted it for the performance of any act).

■ Defendant's unlawful conduct off duty would not necessarily be official misconduct, even if defendant would be expected while off duty to take official action when faced with criminal conduct. There was no evidence that defendant gained possession of the drugs by

virtue of his official position. Defendant had earlier engaged in the conduct of a police officer in frisking the men at the building, and there was some evidence that he gave his badge to someone else, but there was no connection proven between this conduct and his obtaining possession of the cocaine. We hold that defendant committed the drug-possession offense as an individual and not in his official capacity. The conviction for official misconduct is reversed.

## Sentencing Issues

■ Because the trial court imposed the 29-year sentence for both the armed-violence and the possession convictions together, and because the armed-violence conviction has been vacated, the case will be remanded for new sentencing on the conviction for possession with intent to deliver. See *People v. Nunez*, 263 Ill. App. 3d 740, 758, 635 N.E.2d 718 (1994) (resentencing is required where it is not clear whether the trial court was aware that defendant could only be sentenced on the most serious charge).

The judgment of the trial court is affirmed in part, reversed in part, and the cause is remanded for resentencing.

Affirmed in part and reversed in part; cause remanded.

CAHILL, P.J., and BURKE, J., concur.