In the

# United States Court of Appeals
## For the Seventh Circuit

No. 02-1296

TIMOTHY T. HAMPTON,

*Petitioner-Appellee,*

*v.*

GARY L. WYANT, Warden, East Moline Correctional Center,

*Respondent-Appellant.*

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 00 C 3058—**Robert W. Gettleman**, *Judge.*

ARGUED JUNE 4, 2002—DECIDED JULY 9, 2002

Before COFFEY, EASTERBROOK, and WILLIAMS, *Circuit Judges.*

EASTERBROOK, *Circuit Judge.* Timothy Hampton, a member of Chicago's police force, came to the attention of the police in Maywood, Illinois, when he reported to them that someone had robbed his brother Marlan Price, and then started frisking locals as if a Chicago badge carried authority in Maywood as well. Maywood's officers interrogated some suspects that Hampton and Price identified. While one officer was locking up the building where the robbery supposedly occurred, another noticed Price emerging from a car and attempting to reenter the premises. Suspicions

raised by this maneuver—and concerned that there were too many people moving about—this officer noticed that Price had come from a darkened car containing someone else. It was 11 p.m. and the officer could not see inside the car. He asked the car's other occupant to get out. That turned out to be Hampton, and when the officer pointed his flashlight into the vacated passenger compartment he saw a gun—Hampton was entitled to carry a weapon even off duty—and four packages of cocaine. (There is a dispute about whether the Maywood officer saw the cocaine from outside the car or only after entering it to retrieve the gun, but the resolution does not matter for current purposes.) Hampton tried to persuade the Maywood police that he had been carrying the drugs as part of his job, but they wanted more than Hampton's word—and he was unable to provide more, because he was not an undercover drug officer. Later Hampton confessed that the claim of robbery had been manufactured as part of an effort to help Stanley Polk, a drug dealer whose car Hampton had been driving. Polk apparently wanted Maywood's police to arrest Fernando Casas on the trumped-up charge; Polk's reason is unclear, though Hampton confessed that he knew that the transaction involved cocaine in some way. His defense at trial was that the drugs were Polk's and that he had not expected them to be in Polk's car.

A state court convicted Hampton of possessing cocaine with intent to deliver, he was sentenced to 15 years' imprisonment, and the appellate court affirmed, rejecting his contention that the order to get out of the car violated the Constitution's fourth amendment. *People v. Hampton*, 307 Ill. App. 3d 464, 718 N.E.2d 591 (1st Dist. 1999). But Hampton found a more favorable audience in the federal district court, hearing his petition for a writ of habeas corpus under 28 U.S.C. §2254. The judge recognized that the state's appellate court had given extended attention to Hampton's request to suppress the drugs seized from the

car, analyzing not only *Terry v. Ohio*, 392 U.S. 1 (1968), and its successors but also scouring the ALI's *Model Code of Pre-Arraignment Procedure* (1975), and Professor LaFave's treatise (*Search and Seizure* (3d ed. 1996)), for assistance. The federal court did not suspect the state judges of misstating the facts or supplying superficial legal analysis. Nonetheless, the judge wrote, "[u]pon close examination, the court concludes that the cases, statute and treatise cited by the *Hampton* court in reaching its decision do not support that ruling. Moreover, constitutional precedent that was omitted by the *Hampton* court directly contradicts its holding. Thus, the court grants petitioner's application for a writ of habeas corpus." *Hampton v. Fews*, 187 F. Supp. 2d 981, 986-87 (N.D. Ill. 2002).

The State of Illinois does not contest the district judge's conclusion that the Maywood police violated the fourth amendment by directing Hampton to get out of Polk's car. The appeal instead challenges the "thus" in the passage we have quoted: the district judge's belief that Hampton is entitled to collateral relief because an improper seizure occurred. What Hampton needs in order to prevail on a collateral attack is not simply a holding that the directive was invalid, but a conclusion that this error requires application of the exclusionary rule. And *Stone v. Powell*, 428 U.S. 465 (1976), holds that, although both state and federal courts must apply the exclusionary rule at trial and on direct appeal, it is inappropriate to use the exclusionary rule as the basis of collateral relief because it would not appreciably augment the deterrence of improper police conduct. The Court explained, 428 U.S. at 493-95 (footnotes omitted):

> [T]he additional contribution, if any, of the consideration of search-and-seizure claims of state prisoners on collateral review is small in relation to the costs. To be sure, each case in which such claim is considered may add marginally to an awareness of the values protected by the Fourth Amendment.

There is no reason to believe, however, that the overall educative effect of the exclusionary rule would be appreciably diminished if search-and-seizure claims could not be raised in federal habeas corpus review of state convictions. Nor is there reason to assume that any specific disincentive already created by the risk of exclusion of evidence at trial or the reversal of convictions on direct review would be enhanced if there were the further risk that a conviction obtained in state court and affirmed on direct review might be overturned in collateral proceedings often occurring years after the incarceration of the defendant. The view that the deterrence of Fourth Amendment violations would be furthered rests on the dubious assumption that law enforcement authorities would fear that federal habeas review might reveal flaws in a search or seizure that went undetected at trial and on appeal. Even if one rationally could assume that some additional incremental deterrent effect would be present in isolated cases, the resulting advance of the legitimate goal of furthering Fourth Amendment rights would be outweighed by the acknowledged costs to other values vital to a rational system of criminal justice.

. . .

In sum, we conclude that where the State has provided an opportunity for full and fair litigation of a Fourth Amendment claim, a state prisoner may not be granted federal habeas corpus relief on the ground that evidence obtained in an unconstitutional search or seizure was introduced at his trial. In this context the contribution of the exclusionary rule, if any, to the effectuation of the Fourth Amendment is minimal and the substantial societal

costs of application of the rule persist with special
force.

It is therefore not possible to move from a conclusion that
seizure of evidence violated the fourth amendment to a
holding that a writ of habeas corpus must issue. The exclu-
sionary rule is not enforced on collateral attack. Put other-
wise, a person imprisoned following a trial that relies, in
part, on unlawfully seized evidence is not "in custody in vio-
lation of the Constitution or laws or treaties of the United
States." 28 U.S.C. §2254(a). The *seizure* may have violated
the Constitution, but the *custody* does not, because the
exclusionary rule is a social device for deterring official
wrongdoing, not a personal right of defendants. See also
*Reed v. Farley*, 512 U.S. 339, 347-48 (1994) (emphasizing
that *Stone* recognizes limitations on use of the exclusionary
remedy) (plurality opinion). This also means, by the way,
that the Antiterrorism and Effective Death Penalty Act
does not affect *Stone*. The AEDPA's changes to §2254(d) ap-
ply only to cases within the scope of §2254(a), which was
not amended in 1996, and *Stone* is based on an interpreta-
tion of §2254(a) that treats inaccurate administration of the
exclusionary rule as outside the scope of that statute.

What *Stone* requires is that states provide full and fair
hearings so that the exclusionary rule may be enforced with
reasonable (though not perfect) accuracy at trial and on
direct appeal. A competent and intellectually honest judicial
system *is* a personal right of the accused, and a system that
acts with reasonable accuracy is essential to deterrence.
Aware of *Stone*, the district judge in this case suggested
that the appellate court's error shows that Hampton had
not received a full and fair opportunity for litigation. That
approach, however, nullifies the holding of *Stone* and leads
to collateral relief whenever the search violates the fourth
amendment. It cannot be right, for then *Stone* was itself
wrongly decided. *Stone* resolved two consolidated cases. In
one the ninth circuit had held a particular search unconsti-

tutional because the statute under which it had been conducted was unconstitutional. In the other the eighth circuit had held that the warrant supporting a search was invalid because of deficiencies in the affidavits, and that a warrantless entry was unconstitutional because the police lacked probable cause. In all of these respects the federal tribunals disagreed with contrary holdings of the state courts. *Stone* reversed both the eighth and the ninth circuits, not because the Justices thought that the state courts had handled the fourth amendment issues correctly, but because error on a fourth amendment issue does not support a writ of habeas corpus. So if all that occurred in Hampton's case is error, then here too there is no justification for federal collateral relief.

Illinois contends that, having reached this conclusion, we should overrule (or at least modify) a series of opinions that have made the existence of error part of the inquiry into full and fair adjudication. See, e.g., *Terry v. Martin*, 120 F.3d 661, 663 (7th Cir. 1997); *Turentine v. Miller*, 80 F.3d 222, 224 (7th Cir. 1996); *Weber v. Murphy*, 15 F.3d 691, 694 (7th Cir. 1994); *Pearson v. O'Leary*, 959 F.2d 1385, 1391 (7th Cir. 1992). We wrote in *Pearson*, and have repeated since, that an accused receives a full and fair opportunity to litigate if

> (1) he has clearly informed the state court of the factual basis for that claim and has argued that those facts constitute a violation of his fourth amendment rights and (2) the state court has carefully and thoroughly analyzed the facts and (3) applied the proper constitutional case law to the facts.

Illinois wonders how the third of these considerations can be appropriate, given the way *Stone* itself handled a claim of error. The state's concern supposes, however, that *Pearson* required the state to decide the issue *correctly*. But this is not what we meant. What a state has to do is look to the appropriate body of decisional law. Faced with a claim that the police lacked probable cause to make an arrest, a

state court could not respond that in Illinois it is proper to arrest without probable cause. Failure to apply applicable law would show that the accused lacked a full opportunity to prevail on direct appeal. A court that has made up its mind not to enforce the fourth amendment rarely says so directly, though it may leave clues in its treatment of the merits. It is impossible to see how the problem could be identified without paying *some* attention to how the state court dealt with the merits. But as we said in *Turentine* this must not be confused with a search for error. It takes an "egregious error" (80 F.3d at 226) to imply that the state judges have closed their ears and minds to argument—and it is the latter circumstance, not the error itself, that would justify relief under *Stone*. Even an "egregious error" thus is not enough to support a writ of habeas corpus (that's what it means to say that the exclusionary rule does not apply on collateral attack); a blunder, no matter how obvious, matters only in conjunction with other circumstances that imply refusal by the state judiciary to take seriously its obligation to adjudicate claims under the fourth amendment.

So was there any reason to suppose that in Hampton's case the state's judges had their minds closed and were insensible to arguments based on the facts or the Supreme Court's decisions? Hampton concedes that he had (and used) an unfettered opportunity to develop the facts and present his legal arguments. He concedes that the state trial and appellate judges fairly summarized the facts. The district judge upbraided the state court for not citing *Brown v. Texas*, 443 U.S. 47 (1979), a decision that in the district judge's view demonstrates the search's unconstitutionality, and it took the omission as a sign that the state judges had not been paying attention to Hampton's argument or were wilfully blind to applicable law. Problem: Hampton had not cited *Brown* in his own appellate briefs. It is awfully hard to accuse any court of depriving a litigant of full and fair consideration, when its only sin is failing to find, through

independent research, an opinion that neither side cited in the briefs! So too with the district judge's conclusion that the state tribunal relied on the wrong section of LaFave's treatise. None of the appellate briefs had cited LaFave's work or the *Model Code of Pre-Arraignment Procedure*. That the judges did some research beyond the boundaries set by the briefs shows industry rather than the sort of indolence that might deprive the parties of a fair hearing. And if, as the district judge concluded, this independent research was faulty, that's the sort of error that *Stone* puts off limits as the basis of collateral relief. Debate about which section of a legal treatise is the right point of departure is sport for judges, but it holds out no prospect of deterrence through application of the exclusionary rule. What message would be sent to the Maywood police by a writ of habeas corpus so long after March 1996, when they ordered Hampton to get out of Polk's car? It is hard to see how it could improve compliance with the fourth amendment.

At oral argument Hampton's counsel (not the lawyer who represented him in state court) explained that his predecessor had not cited *Brown* because it became relevant only in light of a novel approach taken by the state judges. The court's rationale, counsel contended, was the result of independent research that went wrong, and according to counsel the court's very act of striking out on its own deprived Hampton of a full and fair opportunity to litigate. This would make a virtue of mechanical jurisprudence: a court that trudged through the briefs would be safe under *Stone*'s umbrella, but a court that thought the briefs inadequate and tried to think independently would invite federal intervention to correct any error. That can't be right. As we discussed above, it is the sleepwalking judge, not the diligent one, who deprives the litigant of the personal right to careful, individual consideration.

Any time a judge does independent research there is a risk of error, but judges with some initiative probably err at

lower rates than judges who naively believe that the briefs cover everything worth considering. Courts frequently decide cases on lines of reasoning that can't be found in the briefs. There is no federal entitlement to have a case decided strictly on the basis of precedent cited to the tribunal. See *Elder v. Holloway*, 510 U.S. 510 (1994). If there were, Hampton would be among the losers—for the Supreme Court extended the exclusionary rule to the states in *Mapp v. Ohio*, 367 U.S. 643 (1961), a case in which that possibility was raised by the Justices themselves, not by Mapp. Can Hampton really mean that by injecting a new legal issue the Justices deprived Ohio of a full and fair opportunity to litigate? The Supreme Court is the end of the line, so maybe Ohio did have a beef—more so than Hampton, who still had three arrows in his quiver after the appellate court's decision. He filed a petition for rehearing, sought leave to appeal in the Supreme Court of Illinois, and was entitled to file a petition for certiorari in the Supreme Court of the United States. These afforded ample opportunities to point out any errors in the appellate court's independent research.

Nothing in the record of this case, or the arguments made to us, suggests that Illinois declines to take seriously (in the run of cases, or in Hampton's) its task of enforcing the exclusionary rule on direct appeal. Consequently there is no need to try for some supplemental deterrence by issuing a writ of habeas corpus. As in *Stone* itself, all we have is a claim of error—and that is not enough to support collateral relief based on the exclusionary rule.

REVERSED

A true Copy:

Teste:

_____
*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*

USCA-97-C-006—7-9-02