THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiffs-Appellees, v. TIMOTHY BROGAN, Defendant-Appellant.

First District (4th Division)    No. 1—03—0829

Opinion filed August 26, 2004.

Larry Axelrood and Nancy Braun, both of Offices of Larry Axelrood, of Chicago, for appellant.

Richard A. Devine, State's Attorney, of Chicago (Renee Goldfarb and Judy L. DeAngelis, Assistant State's Attorneys, of counsel), for the People.

JUSTICE GREIMAN delivered the opinion of the court:

Defendant Timothy Brogan was charged with multiple counts of concealing or aiding a fugitive, official misconduct, and obstruction of justice. Following a bench trial, the defendant was found guilty on all counts charged. His motion for a new trial was denied, and he was sentenced to 3½ years' imprisonment. Defendant then filed a motion for bond pending appeal that the trial court denied, but we granted, on April 2, 2003. Defendant now appeals from his conviction and sentence, and for the reasons that follow, we reverse in part and affirm in part.

The facts of this case involve the highly publicized events surrounding two wedding receptions on August 5, 2000, at the William Tell Holiday Inn in Countryside, Illinois. Because we have previously recounted those facts in great detail in our previous opinion, *People v. Schickel*, 347 Ill. App. 3d 889 (2004), we will only provide those facts necessary for the disposition of the issues at hand.

As the record bears out, on the evening of August 5, 2000, the defendant was employed as a Cook County correctional officer and was off duty during the time that he attended one of the two weddings at the Holiday Inn. The record also demonstrates that after the two

wedding receptions had concluded at approximately midnight, people from both parties went to the hotel bar. Apparently, the defendant and codefendant, Ronald Schickel,[1] along with 10 to 15 other people, lined the wall of the hotel that led from the lobby to the bar. When other wedding guests would walk past, the people lined up against the wall began making harassing comments to female guests and verbally challenging the male guests to fight.

At this time, one of the guests, Richard Lange, told the bartender to call security. Eventually, the hotel manager, William Pishotta, called the Countryside police to assist in closing down the hotel bar. After the Countryside police arrived, the defendant told them that he was a Cook County sheriff's deputy, he showed them his badge, and he told them that he was sorry and that he would take care of everything. Apparently, Mr. Pishotta then informed the police that hotel security could handle the situation. However, when hotel security arrived, defendant again flashed his badge and told the security officers that he was a Cook County sheriff. He then explained to one of the security guards, Mr. Rob Howe, "I don't need you people here. You're like f---ing clowns." Mr. Howe then left the hotel.

Later that night, the security guards were called upon to control another incident in the parking lot of the Holiday Inn. Upon arrival, they again encountered the defendant flashing his badge, declaring that he was a Cook County sheriff and that he would handle the situation in the parking lot. Schickel, apparently, was also with him and was also claiming to be a Cook County sheriff. After the Countryside police returned to the hotel, defendant again showed his badge and identification card, identified himself as a Cook County sheriff, and stated that he had the information of the drivers of the vehicles involved in the incident.

At that time, or soon thereafter, fights began breaking out in the area outside the bar and near the lobby, resulting in complete chaos. Objects in the lobby were smashed, furniture was upended, and people were crying. One of the wedding guests, Mr. Rademacher, had been punched in the face and shoved to the ground, and was being choked by another individual. After another wedding guest intervened, Mr. Rademacher was released from the choke hold, but was hit immediately from behind by the defendant, who slammed him against a window and held him there for approximately 15 seconds. After Mr.

---

[1]Codefendant Schickel was found guilty of manslaughter and was sentenced to 4½ years' imprisonment. He is not a party to this appeal, but his conviction was previously affirmed by this court in *People v. Schickel*, 348 Ill. App. 3d 889 (2004).

Rademacher's wife slapped the defendant and yelled at him while he was holding her husband, the defendant said "I'm a cop, my name is Tim, I'm a cop." At that point the defendant released Mr. Rademacher from the window and forcibly took him to a bench in the hallway. After Mrs. Rademacher asked the defendant whether he was going to arrest her husband, defendant said "no, but :f he gets off the bench, I'll kill him."

At approximately the same time, the victim entered the hotel and noticed that the men lining the wall were still harassing some women. As the victim tried to get the women away from the men, the defendant allegedly told the victim to "back off motherf-----." The record demonstrates some evidence that, at that point, the defendant and Schickel pushed and punched the victim in the face. After Schickel hit the victim, the victim tried to flee into the lobby, but was grabbed by the men in the hallway, who pulled him into the vestibule by the neck, got on top of him, and kicked and beat him.

At that point, Mr. Howe, accompanied by another security guard, Mr. Aguirre, had been called back to the hotel and had witnessed the defendant pushing the victim. Consequently, according to their testimony, they tried to get people off of the victim, who was at the bottom of a pile. While they were able to get him to stand, the defendant still had him in a headlock, and both tumbled into the vestibule area. When the Countryside police *again* arrived, the defendant identified himself for the third time as a Cook County sheriff, flashed his badge, and told the police that the victim should be arrested because he was "fighting with everybody." After the defendant released the victim, Schickel, who was also in the vestibule area, sprang into the defendant's position and put the victim in a headlock. At that point, Schickel was in the vestibule, on top of the victim, choking him by the neck as he lay facedown on the ground. Officer Battaglia from the Countryside police said the choker, whom he could not identify, had the victim in a "carotid artery choke hold," which was dangerous and deadly, if applied improperly.

Accepting what the defendant had told them, after defendant had announced himself as a Cook County sheriff and once again flashed his badge, the Countryside police attempted to arrest and handcuff the victim. While Schickel still had the victim in a choke hold, the Countryside police told the victim that he was under arrest and tried to handcuff him while he resisted. During that time, Officer Battaglia told the choker to release the choke hold, but the choker did not comply. The record also reflects that the defendant remained in the vestibule during that time. Once again, Officer Battaglia told the choker to release the victim and then felt the victim fall limp onto his

own right arm. The choker stated "he's out cold," but he still appeared to be breathing to Officer Battaglia.

According to Mr. Pishotta, the defendant lifted Schickel up at that time, but could not be certain if he lifted him off of the victim or the ground. After Schickel was upright, Mr. Pishotta heard the defendant say to Schickel that they should "get out of here." At that point, they both went outside the hotel. When Schickel was outside the hotel with the defendant, wearing a shirt that had blood on the left side, he said that he "felt a snap." Although Mr. Pishotta ran outside soon thereafter in the attempt to find Schickel, Schickel was nowhere to be found. However, he did find the defendant standing in the driveway and asked where the other gentleman was. In reply, defendant stated that he "took off." Mr. Pishotta then asked the defendant if he knew who the other gentleman was, and the defendant apparently replied, "yeah, but I'd rather not tell you that." Defendant then said to Pishotta, "try not to point this guy out because I don't want him to get into trouble" because Schickel had just gotten a job and his wife just had a baby or "something to that effect." When Mr. Pishotta asked the name of the man who was choking the victim, the defendant said that he could not tell him. The defendant then turned around and apologized to Pishotta, saying that he should not have asked Pishotta to do that.

Later that evening, the defendant told his ex-fiancée and another female wedding guest to find "Ronnie" and get him out of the hotel because "everybody was leaving." Defendant also told Jow Ivanauskas, an usher at one of the weddings, that they had to "get Ronny out of here." When the two women found Schickel, he asked why he had to leave because "he wasn't there, that he didn't know what happened." One of the women then told Schickel that the defendant told her to get him out of the hotel "if she had to drag Ronny kicking and screaming." Schickel then left the hotel using rapid check-out approximately half an hour later.

A few days later, the defendant was in a car with Sheila Roberts and Kevin Tomkins and told them that he had done nothing wrong and that "he wasn't going to get in trouble for this." Ms. Roberts told the grand jury that the defendant also had said that he would "tell on" Schickel if anyone tried to blame him. A few days after that incident, according to the grand jury testimony of Dan O'Rourke, Schickel told Mr. O'Rourke that he burned the suit he was wearing the night of the wedding and bought another suit exactly like that one.

During the investigation of the defendant, Sergeant Carolyn Black from the Illinois State Police interviewed the defendant on January

29, 2001. Sergeant Black testified that the defendant stated that after the wedding ended, he and Schickel's brother went to the hotel bar and then outside to the parking lot. He then described the altercation in the parking lot and that he told the people involved that he was hotel security, but when the Countryside police arrived, he stated that he and Schickel's brother were off-duty Cook County sheriffs. After speaking with the Countryside police in the parking lot, he went back inside where he saw a "herd of people running down the hallway towards the lobby." He stated that he then ran down that hallway to the vestibule where another large fight was occurring, and that he pulled a man off of one of his friends, put his arm behind his back, pinned him against a window, and then walked him to a bench. He told Sergeant Black that he told the man not to move and that the man's wife was slapping him in the back as he took the man down the hallway.

Defendant then told Sergeant Black that the first time he saw the victim was when he stepped over him to go have a cigarette and that the victim was lying on the floor, not moving. The defendant claimed that he tried to get the victim to stand upright, but that he said "f--- it. Dead weight." He also stated that he did not witness police officers handcuffing the victim and that he did not identify himself as a police officer while he was in the vestibule. At that point, he stated, he saw Schickel outside and he asked him what happened. Schickel apparently told him, "I just lost control," but the defendant told Sergeant Black that Schickel said that "it lost control." Defendant claimed that he did not see any blood on Schickel's shirt.

Defendant said that Schickel then went back into the hotel. The hotel manager was also standing outside at that time and told him that the victim was dead. Defendant then admitted to Sergeant Black that he told his ex-fiancée and two other women to find Schickel and to get him out of the hotel, and the reason he had told them that was because Schickel was not in his sight and he had been "fighting." He also admitted to displaying his badge twice that evening: once to the security guards after he told them he could help; and once to the Countryside police after the incident in the parking lot.

However, the defendant denied to Sergeant Black that he told his friend, Mr. Tomkins, that "he wasn't going down for what Schickel did, that he would give up Ronald in a heartbeat." He also denied that he restrained the victim in the vestibule or that he saw Schickel in the vestibule, or that he saw anyone, including Schickel, put a choke hold on the victim. He denied telling the Countryside officers to place the victim under arrest, and further denied telling Mr. Pishotta, the hotel manager, not to identify Schickel because his wife was having a baby.

After the State rested, the defendant's motion for a directed finding was denied. The parties then entered into various stipulations, one of which was that defendant was employed as a Cook County correctional officer on August 5-6, 2000, that he was off duty at the time, that the Cook County Department of Corrections General Orders were applicable to the defendant on August 5-6, 2000, and that the defendant acknowledged reading and understanding his duty to abide by the Cook County Department of Corrections General Orders and Procedures.

The defense presented traffic patrol officer Anthony Jarvis, who stated that he had been at the William Tell Holiday Inn on August 6, 2000, at approximately 2 a.m. Essentially, Jarvis testified that he had never seen anything like the scene that evening in his nine years on the force. He also testified that when he went to the front of the vestibule from the lobby, he saw "two Countryside police officers, a subject down on the ground, and two other subjects in the vestibule." He testified that the two nonpolice subjects were standing to the left side of the vestibule toward the corner in the back, and he later identified them as Kevin and Brian Tomkins. On cross-examination, Officer Jarvis stated that he attempted to prevent entry into the vestibule, and when defendant attempted to enter, Jarvis grabbed him by the arm. At that point, defendant stated, "don't touch me. I'm a f----- Cook County Sheriff." Because Officer Jarvis believed that the other Countryside officers had the situation in control, he walked away from the vestibule.

After the defense's presentation of witnesses, neither the defendant nor Schickel chose to testify on his own behalf. After the trial court fully admonished the defendants as to their rights to testify and was assured that they had knowingly and voluntarily waived that right, the trial court heard closing arguments. Thereafter, in rendering its decision, the trial court mapped out the facts of the case as it saw them. Specifically, it found Mr. Pishotta's testimony to be credible, despite some inconsistencies, and put particular emphasis on the defendant's protection of Schickel, when he told the group of women to "tell Ronny to get out." As a result, the court found that the defendant was in the vestibule when Schickel was choking the victim and that the evidence against the defendant "fits like a hand in a glove *** and it's a perfect fit." He also stated that the defendant "sacrificed the public good, violated his oath, betrayed the public trust *** by doing what he did on August 6, 2000 *** to help keep Ronald Schickel Jr. out of harm[']s way."

The trial court then found the defendant guilty. After denying the defendants' posttrial motions, the trial court sentenced the defendant

to 3½ years' imprisonment. Defendant now appeals his conviction and sentence.

Defendant's first argument on appeal is that the State failed to establish one or more elements of each crime charged and, therefore, judgment for acquittal should be entered for him. Alternatively, he argues that he was not proven guilty beyond a reasonable doubt because he was not acting in his "official capacity" when he refused to tell Mr. Pishotta his codefendant's identity and, moreover, because he did not know that Schickel had committed an offense.

To defendant's first allegation, the State argues that defense counsel's failure to renew defendant's motion for a directed verdict at the conclusion of the State's case waives his right to argue such a motion on appeal. *People v. Barrow*, 133 Ill. 2d 226, 249 (1989). Ordinarily, where a defendant elects to present evidence following the denial of his motion for directed finding, any error in the trial court's ruling on the motion is waived unless the defendant renews the objection at the close of all the evidence. *Barrow*, 133 Ill. 2d at 249; *People v. Turner*, 127 Ill. App. 3d 784, 789 (1984).

However, where a defendant challenges the sufficiency of the State's indictment against him, he is making a jurisdictional challenge that may be challenged for the first time on appeal. *People v. Adams*, 64 Ill. App. 3d 547, 548 (1978). In the present case, the defendant never challenged the sufficiency of the indictment at trial, but raises it now on appeal. Accordingly, his argument is not that the trial court erred in denying his motion for judgment of acquittal, but that the State's indictment failed to allege all the elements essential to the proof of the purported criminal act, thus necessitating a judgment of acquittal. Thus, the State's waiver argument is not well-taken, and we will entertain defendant's argument. Because the issue of whether an indictment sufficiently alleges all the elements of a crime is a question of law, our review is *de novo*. *People v. Simac*, 321 Ill. App. 3d 1001, 1003 (2001).

■ As noted, the court entered judgment against defendant on four counts of official misconduct. In pertinent part, the official misconduct statute reads:

> "A public officer or employee commits misconduct when, in his official capacity he:
> ***
> (b) knowingly performs an act he knows is forbidden by law."
> 720 ILCS 5/33—3 (West 2000).

The official misconduct statute itself does not prohibit specific conduct, but exists by reference to the violation of another statute, administrative rule, or legal duty. In other words, the statute punishes acts that

are expressly prohibited by positive law. *People v. Wilkinson*, 285 Ill. App. 3d 727, 733 (1996). Moreover, the charge can be based on the violation of administrative rules or regulations even if that rule or regulation itself does not carry a penalty for its violation. *People v. Davis*, 281 Ill. App. 3d 984, 989 (1996).

•2 Of the four counts on which judgment was entered, the first three are based upon the concealing-or-aiding-a-fugitive statute, section 31—5 of the Criminal Code of 1961 (720 ILCS 5/31—5 (West 2000)), which states:

> "Every person not standing in the relation of husband, wife, parent, child, brother or sister to the offender, who, with intent to prevent the apprehension of the offender, conceals his knowledge that an offense has been committed or harbors, aids or conceals the offender, commits a Class 4 felony." 720 ILCS 5/31—5 (West 2000).

Count XV states that the defendant committed the offense of official misconduct "in that he, being a public employee, in his official capacity, to wit: Cook County Correctional Officer, knowingly performed an act which he knew by law he was forbidden to perform, to wit: Timothy Brogan committed the offense of concealing or aiding a fugitive in that he, knowing that Ronald Schickel committed an offense, and with the intent to prevent Ronald Schickel's apprehension, aided Ronald Schickel, told individuals to get Ronald Schickel out of the Holiday Inn *** before Ronald Schickel could be apprehended by law enforcement authorities."

Count XVI also alleges official misconduct based on concealing or aiding a fugitive and tracks the language of count XV, except for the specific conduct alleged: "in that he, knowing that Ronald Schickel committed an offense, and with the intent to prevent Ronald Schickel's apprehension, aided Ronald Schickel by refusing to give Ronald Schickel's name to William Pishotta." Count XVII again uses the language of the concealing-a-fugitive statute, but states that Brogan aided Schickel by telling "William Pishotta not to identify Ronald Schickel as having choked Michael Chambers." Count XXVII, the final count, charged the defendant with official misconduct for knowingly violating Cook County Department of Corrections General Order 4.1 (III)(A.)(18), and states "serious misconduct includes making a false official report, either oral or written, in that he falsely reported to law enforcement officers that he did not see Richard Schickel choke Michael Chambers."

In other words, defendant notes, in order to properly allege these four counts, the following elements must be present: defendant (1) acting in his official capacity, and (2) knowingly committing an act he knew to be forbidden by law. Thereafter, two additional elements are

required for the counts based on aiding a fugitive: (1) the defendant knew Schickel committed an offense and (2) the defendant, with the intent to prevent Schickel's apprehension, aided him by specific conduct. The additional element for count XXVII is making a false official report in which defendant falsely said he did not see Schickel choke the deceased. In light of those requirements, defendant argues that the State's indictment failed in two regards, as it did not sufficiently allege that any of his acts were performed in an official capacity, and it did not establish that the defendant was aware that Schickel had committed a crime and that defendant then made an affirmative action to conceal such knowledge.

Regarding whether the indictment competently alleged that defendant was acting in an official capacity, defendant argues that the mere fact that an accused is a law enforcement officer is not the equivalent of alleging that wrongful conduct was committed in an official capacity. For example, defendant notes, in *People v. Jordan*, 15 Ill. App. 3d 672, 676 (1973), this court found that money a police officer received while on duty from an ambulance driver was not received in an official capacity where there was no evidence that the officer accepted it for performance of any act. In *People v. Hampton*, 307 Ill. App. 3d 464 (1999), this court again found that where a police officer who was convicted of drug possession did not use his official position to obtain the drugs, he could not be guilty of official misconduct, even though he was guilty of the underlying drug charge.

In the present case, defendant claims that the facts demonstrate that he was off duty, attending a wedding celebration when the multiple fights ensued, resulting in the victim's death. Defendant concedes that while he may have been acting in an official capacity when he performed law enforcement types of activities—such as separating combatants and attempting to disrupt the fighting—those activities are not what is claimed to be illegal. In other words, simply identifying himself as a law enforcement officer to the security guards and flashing his badge in those situations, defendant argues, may have been part of his official conduct, but it was not official *mis*conduct. To that end, defendant claims that nowhere in the indictment does the State allege that he used the power attached to his position, or exploit his official status, in telling his friends to get Schickel out of the hotel (count XV), refusing to give Schickel's name to Pishotta (count XVI), or in telling Pishotta not to identify the person involved in the melee with the victim (count XVII). In fact, defendant argues, nothing about the facts in the record suggests that he was acting in anything but a personal capacity, as those acts were undertaken out of personal concern for his friend. And with regard to count XXVII, defendant

argues that nothing in the record suggests that he was creating an "official report" as an officer. Instead, defendant claims, he was speaking as a citizen witness and giving his own recollection of the events to cooperate with the investigation. Thus, defendant argues, because the State did not allege sufficient facts that he was acting in such a capacity when carrying out his purportedly illegal actions, the official misconduct statute does not apply.

Moreover, with regard to the actual multiple offenses of aiding a fugitive (counts XV through XVII), defendant argues that case law requires that in order to "conceal" knowledge of an offense or an offender, a person must take an "affirmative act" in connection with the concealment. For example, he argues that in *People v. Thomas*, 198 Ill. App. 3d 1035 (1990), this court found that the defendant's failure to disclose to a detective his full knowledge of an assailant's identity was not concealment of a fugitive. Moreover, in *People v. Vath*, 38 Ill. App. 3d 389 (1976), this court also found that the defendant's denial to police of his knowledge of the assailant's identity was not an affirmative act of concealment.

In the present case, defendant argues the facts in the indictment fail to demonstrate that defendant was even aware that Schickel had committed a crime, much less that the defendant saw Schickel choking the deceased. Alternatively, defendant argues that even if the indictment sufficiently alleges that he had the requisite knowledge that Schickel killed the victim, none of his remarks to his friends, Pishotta, or Sergeant Black constituted affirmative acts of concealment. Rather, defendant claims, such actions were essentially a failure to disclose full knowledge of the assailant which, under *Thomas*, 198 Ill. App. 3d 1035, and *Vath*, 38 Ill. App. 3d 389, this court has not found to constitute an affirmative act of concealment. Accordingly, defendant concludes, because the State has failed to present any of these requisite elements in its indictment, we should order a directed finding in his favor.

•3 All defendants have a fundamental, constitutional right to be informed of the "nature and cause" of the charges against them. *People v. Meyers*, 158 Ill. 2d 46, 51 (1994). In Illinois, this fundamental right is given substance by statute and incorporated into section 111—3 of the Code of Criminal Procedure of 1963 (the Criminal Procedure Code) (725 ILCS 5/111—3 (West 2000)). See *Meyers*, 158 Ill. 2d at 51. However, if an indictment is attacked for the first time on appeal, it is sufficient that the indictment " 'apprised the accused of the precise offense charged with sufficient specificity to prepare his defense and allow pleading a resulting conviction as a bar to future prosecution arising out of the same conduct.' " *People v. Thingvold*,

145 Ill. 2d 441, 448 (1991), quoting *People v. Gilmore*, 63 Ill. 2d 23, 29 (1976), and citing *People v. Pujoue*, 61 Ill. 2d 335, 339 (1975). Put another way, a reviewing court should consider whether the defect in the indictment prejudiced the defendant in preparing his defense. *Thingvold*, 145 Ill. 2d at 448.

Moreover, we have found that under normal circumstances, the requirements of section 111—3 are met when the counts of a complaint follow the statutory language in setting out the nature and elements of an offense. *People v. Davis*, 281 Ill. App. 3d 984, 987 (1996). As we noted in *People v. Swartwout*, 311 Ill. App. 3d 250, 256 (2000):

> "The relevant inquiry is not whether a charging instrument could have described an offense with more particularity, but whether there is sufficient particularity to allow the defendant to prepare a defense. *Meyers*, 158 Ill. 2d at 54. A charging instrument is a preliminary pleading, and it need not contain more than a cursory statement of the facts. *[People v.]Smith*, 259 Ill. App. 3d [492,] 497 [(1994)]. If the charging instrument meets the minimum requirements of section 111—3(a) but (combined with any discovery the State furnishes) is insufficient to allow the defendant to prepare a defense, he or she can—and should—seek a bill of particulars. *Smith*, 259 Ill. App. 3d at 498; *People v. Intercoastal Realty, Inc.*, 148 Ill. App. 3d 964, 971 (1986)." *Swartwout*, 311 Ill. App. 3d at 256.

Indeed, this court has found a charging instrument to be sufficient where a defendant is able to discern from the charging document that at a specific time and at a specific place the statute had been violated. *Swartwout*, 311 Ill. App. 3d at 256, citing *Intercoastal*, 148 Ill. App. 3d at 971. As the *Intercoastal* court concluded:

> "It [is] not necessary to allege the precise details of the condition of the property in the charging instrument. [Citation.] Any further information defendants [need] to prepare their defense [can] be obtained through a bill of particulars. [Citations.]" *Intercoastal*, 148 Ill. App. 3d at 971.

■ In the present case, the language of all four charges of which the defendant was convicted closely tracked the language of the official misconduct statute, section 33—3 of the Criminal Code of 1961. 720 ILCS 5/33—3 (West 2000). Indeed, we find that the indictment alleged that at a specific place on a specific date, the defendant, who was an officer acting in his official capacity, actively concealed his knowledge and aided Schickel to prevent Schickel's apprehension.

While defendant asserts that the State does not adequately allege how and when the defendant was acting in his official capacity, does not adequately allege that the defendant knew that Schickel had choked the victim, and does not elucidate how his actions constituted

active concealment, we find that such arguments focus only on the nature of the proof rather than the nature of the offenses. Where the defendant has not alleged that the indictment failed to particularize his offenses such that his ability to present a defense was prejudiced, his claim must fail. Pursuant to *Intercoastal*, therefore, we find that the State's indictment charging official misconduct following the statutory language of section 33—3 of the Criminal Code of 1961 is sufficient under section 111—3. See *Intercoastal*, 148 Ill. App. 3d at 971. Because the State's indictment provided sufficient particularity to allow defendant to prepare his defense, we deny defendant's motion to dismiss.

Defendant next argues that the State failed to prove him guilty beyond a reasonable doubt of official misconduct. A conviction challenged on sufficiency of evidence grounds will not be reversed unless the evidence is so improbable that there remains a reasonable doubt of the defendant's guilt. *People v. Eyler*, 133 Ill. 2d 173, 191 (1989). In other words, a defendant can only prevail in such a challenge if the reviewing court finds that no reasonable fact finder could have found the essential elements of the crime beyond a reasonable doubt when viewing the evidence in the light most favorable to the prosecution. *People v. Collins*, 106 Ill. 2d 237, 261 (1985). In that regard, it is the fact finder's function to assess the credibility of the witnesses and to resolve conflicts or inconsistencies in their testimony based upon the evidence, and a reviewing court will not substitute its judgment for that of the trier of fact. *People v. Novotny*, 41 Ill. 2d 401, 412 (1968).

With regard to the charges, we have found the offense of official misconduct was designed to reach those situations where a public officer has exploited his official position to the detriment of the public good. *People v. Steinmann*, 57 Ill. App. 3d 887, 897 (1978). As noted, the two elements of the offenses of official misconduct as charged in the present case are that (1) defendant knowingly performed an act which he knew was forbidden by law to perform, and (2) that he did so in his official capacity. Defendant challenges the trial court's verdict as it pertains to both elements for all four charges against him. Consequently, our inquiry must focus upon whether there is evidence in the record to support the trial court's conclusion.

Taking the second prong first, the defendant argues that he was "off duty" when he attended the wedding celebration. While admitting that he did act in his official capacity at certain points in the night, he asserts that he was not acting in his official capacity when he spoke to either Pishotta or Sergeant Black, or when he told his friends to get Schickel out of the hotel. The State argues, however, that the defendant cannot pick and choose when he was acting in his

official capacity. To that end, the State asserts that the record demonstrates clear evidence that the defendant interposed his public office and his authority as a Cook County sheriff throughout the evening.

First, when the Countryside police arrived at the hotel in response to the original disturbance in the hotel bar, the defendant told them that he was a Cook County sheriff's deputy, showed them his sheriff's badge, and told them that he would take care of everything. After the police left and hotel security came, he again flashed his badge, again introduced himself as a sheriff's deputy, and told one of the security guards, "I don't need you people here. You're like f------ clowns." The record reflects that a short time later, the defendant again encountered the security guards when dealing with the incident in the parking lot, where he flashed his badge, said that he was a Cook County sheriff, and that he would handle the situation in the parking lot. When the Countryside police arrived to check on the parking lot situation, he again flashed his badge, plus his identification card, identified himself as a Cook County sheriff's deputy, and stated that he could help the Countryside police.

Soon after that incident, when the fighting between the two wedding parties was out of control, the evidence demonstrates that defendant hit Mr. Rademacher from behind, slammed him up against a window, and held him there for approximately 15 seconds. When Mrs. Rademacher tried to intervene, he told her "I'm a cop, my name is Tim, I'm a cop." After defendant released Mr. Rademacher and forcibly took him to a bench in the hallway, Mrs Rademacher asked if defendant was going to arrest her husband. Defendant responded "no, but if he gets off the bench, I'll kill him."

Finally, at the end of the evening when the Countryside police arrived for the third time, defendant identified himself again as a Cook County sheriff's deputy, displayed his badge to the police, and told everyone that it was the victim who was "fighting with everybody." Based upon that representation, the Countryside police then spent their time handcuffing the victim while Schickel was able to flee from the hotel.

The record indeed demonstrates that the defendant identified himself as a sheriff's deputy at least six times that evening to gain control over multiple situations. However, "not all actions of a police officer, even those performed while on duty, are done in one's official capacity." *Steinmann*, 57 Ill. App. 3d at 897. Indeed, case law has demonstrated that the key to proving a conviction for official misconduct is that the alleged perpetrator actively used his or her position or official status to "[k]nowingly perform an act which he

knows he is forbidden by law to perform." 720 ILCS 5/33—3 (West 2000). In other words, its not enough that a defendant commits a crime when acting in an official capacity; he must also use the very fact of his authority or position to further the commission of that crime. See *Steinmann*, 57 Ill. App. 3d at 897, and cases cited therein.

As a result, the defendant's repeated identification of himself as a sheriff's deputy, by itself, is insufficient to bring him under the purview of the official misconduct statute, even though such a demeanor makes defendant's attempt to separate what was not done in an official capacity all the more difficult. Rather, there must be evidence of abuse of that official capacity. In that regard, we find there is ample evidence to sustain the trial court's findings on counts XVI and XVII. All evening, defendant had introduced himself to Pishotta as a sheriff's deputy and as someone who was controlling the situation. Accordingly, we find it quite reasonable for a trier of fact to deduce that the defendant was using his status as an officer as a means of persuading Pishotta not to identify Schickel and preventing him from learning his identity. Similarly, with regard to count XXVII, it was entirely reasonable to find that defendant's oral report to Sergeant Black was an attempt to utilize his official capacity as a sheriff's deputy to provide inaccurate facts that would be imbued automatically with the enhanced credibility given to police officers. Thus, we sustain the trial court's findings as to count XXVII as well.

Count XV, however, presents a different set of facts. There, the defendant is charged with knowingly performing a forbidden act, *i.e.*, committing the offense of aiding a fugitive, by telling "individuals to get Ronald Schickel out of the Holiday Inn *** before Ronald Schickel could be apprehended by law enforcement authorities" while acting in an official capacity. However, no evidence was ever presented at trial to suggest that the defendant was utilizing the power attached to his status as a sheriff's deputy when he told his friends to "get Ronny out." Indeed, the State offered no evidence to suggest that the defendant's friends warned Schickel to leave the hotel for any other than personal reasons. Schickel was the friend of the defendant and the other individuals, and the evidence clearly shows that the defendant was acting in an individual capacity when he asked the others to hasten Schickel's departure from the hotel. Quite simply, he did not want to see his friend caught. Accordingly, because the State failed to prove a requisite element of official misconduct in count XV, we reverse the defendant's conviction on that charge.

■ Defendant's second challenge to the evidence is that the State did not prove the underlying offense, that he knowingly aided a fugitive. As noted, to convict someone under the fugitive statute, the State

must prove that the accused (1) concealed his knowledge that an offense had been committed, and (2) with the intent to prevent the apprehension of the offender, harbors, aids, or conceals him. 720 ILCS 5/31—5 (West 2000). Defendant argues that case law requires that in order to "conceal" knowledge of an offender, a person must take an "affirmative act" in connection with the concealment. See *People v. Thomas*, 198 Ill. App. 3d 1035, 1038 (1990) (a defendant's failure to disclose to a detective the full scope of his knowledge of an assailant's identity was held not to constitute concealment of a fugitive); *People v. Donelson*, 45 Ill. App. 3d 609, 612 (1977) (court held that the failure to reveal knowledge that someone else has committed a crime is not an affirmative act of concealment).

■ In the present case, defendant asserts that the State's evidence failed to show his knowledge that Schickel committed the crime of homicide. For that matter, defendant argues, the State failed to prove that he saw Schickel choking the deceased. However, defendant claims, even if this court were to assume that he had the requisite knowledge that Schickel killed the victim, there was no evidence to suggest that he took an affirmative act to conceal that knowledge. Rather, he argues that all of his comments and actions were, like in the cases previously mentioned, simply a failure to disclose the full scope of his knowledge. We disagree.

Previously, this court has found that the mental state of "knowledge" is ordinarily proven by circumstantial evidence as opposed to direct proof. *People v. Sedlacko*, 65 Ill. App. 3d 659, 663 (1978). And as previously noted, a defendant can only prevail in a challenge to the sufficiency of the evidence if we find that no reasonable fact finder could have found the essential elements of the crime beyond a reasonable doubt when viewing the evidence in the light most favorable to the prosecution. *Collins*, 106 Ill. 2d at 261.

Initially, we find the record reveals evidence that it was actually the defendant who had the victim in a headlock when they fell into the vestibule door area. At that point, Schickel was also in the vestibule area. According to one of the security officers, when the police arrived, the defendant released the victim from the headlock and Schickel jumped in and replaced the defendant, performing a "carotid artery choke" on the victim. At that point, the record reveals that Schickel was in the vestibule on top of the victim, choking him by his neck, as the victim lay facedown. When the police attempted to handcuff the victim based upon the defendant's representations to them, there is evidence that Schickel still had the victim in a choke hold while the defendant remained in the vestibule.

While the defendant claims that his conviction cannot stand because he did not see Schickel in the vestibule, such an argument

ignores that the trial court heard testimony of certain witnesses who *did* see him in the vestibule. Specifically, an individual named Terrance Jordan saw the defendant holding the victim when they went through the vestibule doors; Officer Battaglia saw the defendant in the vestibule while the defendant was yelling at the officer that the victim was under arrest and that the defendant was a Cook County sheriff's deputy; Officer Kenneth Goluszka saw the defendant holding the victim in a headlock and bringing him to the ground in the vestibule, after which the defendant was shouting that the victim was under arrest; and William Pishotta saw the defendant in the vestibule with Schickel and heard him say to Schickel, "let's get out of here." Defendant also argues that many of these witnesses' statements should be reexamined in light of their credibility and inherent conflicts with one another. As noted, however, it is only the fact finder's function to assess the credibility of the witnesses and to resolve conflicts in their testimony, and we will not substitute our judgment for that of the trier of fact. *People v. Novotny*, 41 Ill. 2d 401, 412 (1968).

Furthermore, contrary to the defendant's argument, it is not necessary that the defendant *know* that Schickel had committed a homicide. As the record demonstrates, the indictment of the defendant states that defendant was aware that Schickel had committed an "offense," which is defined as "a violation of any penal statute of this State." 720 ILCS 5/2—12 (West 2000). Thus, where the concealment statute criminalizes the act of concealing an "offender," and an offender is an individual who violates any penal statute, all that was necessary was for the State to prove the defendant guilty of aiding a fugitive was that the defendant knew that Schickel had committed *an offense*. As previously noted, we find the record demonstrates that the defendant knew, at the very minimum, that Schickel had committed a battery against the victim in the Holiday Inn vestibule.

Finally, with regard to whether the defendant took "an affirmative act in connection with the concealment," we find ample evidence to suggest that defendant's actions are not akin to those where a defendant gives incomplete information. Here, the defendant specifically asked Pishotta not to identify Schickel as the choker; he specifically refused to tell Pishotta where Schickel was; he specifically refused to identify Schickel to Pishotta when Pishotta asked who he was, after Pishotta had seen the two men in the vestibule together and the evidence suggested that defendant clearly knew about whom Pishotta was asking; and he specifically told Pishotta to "try not to point this guy out because I don't want him to get into trouble" because Schickel had just gotten a job and his wife had just had a baby "or something to that effect." He then took another affirmative step, telling his ex-

fiancée and some other wedding guests to find "Ronny" and "get him out of the hotel" even "if she had to drag [him] kicking and screaming." Finally, the defendant's representations to Sergeant Black reach far beyond a passive nondisclosure of the events of that evening and into a full-fledged misrepresentation of what transpired. Specifically, he claimed that the first time he saw the victim was when he stepped over him to get a cigarette and that the victim was lying on the floor, not moving. Where the evidence suggests that defendant did, in fact, see Schickel choke the victim, we find it entirely reasonable for a fact finder to have found that the defendant's conversation with Sergeant Black, as well as the others constituting the offenses of which he was convicted, were all "affirmative acts" in connection with his concealment of Schickel. Thus, we reject the defendant's challenge to the sufficiency of the State's evidence and hold that the trial court did not err in finding him guilty of the underlying offenses of concealing a fugitive.

■ We note that while we have reversed one conviction for the enhanced charge of official misconduct (count XV), we have found that the evidence established that defendant was guilty of all four underlying offenses of concealing a fugitive. Accordingly, with regard to count XV, we find the evidence at trial supports a finding of guilt against the defendant for concealing a fugitive (a Class 4 felony that carries a sentence of not less than one year and not more than three years' imprisonment) as a lesser included offense of official misconduct. 730 ILCS 5/5—8—1(a)(7) (West 1996). Conversely, we note that the trial court properly convicted the defendant of three counts of official misconduct (counts XVI, XVII, and XXVII), a Class 3 felony that carries a sentence of not less than two years and not more than five years. 730 ILCS 5/5—8—1(a)(6) (West 1996). As the trial court sentenced the defendant to 3½ years' total imprisonment—a sentence well within the statutory bounds—and where it is clear that the trial court did not place any significant weight on the improperly found aggravating factor of official misconduct for count XV, we need not remand the matter for resentencing. See *People v. Bourke*, 96 Ill. 2d 327, 332 (1983) ("where it can be determined from the record that the weight placed on the improperly considered aggravating factor was so insignificant that it did not lead to a greater sentence, remandment is not required. [Citations.]").

For the foregoing reasons, we affirm in part and reverse in part the decision of the trial court.

Affirmed in part and reversed in part.

QUINN, P.J., and HARTMAN, J., concur.