NOTICE
This Order was filed under
Supreme Court Rule 23 and is
not precedent except in the
limited circumstances allowed
under Rule 23(e)(1).

2023 IL App (4th) 220368-U

NO. 4-22-0368

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| Plaintiff-Appellee, | ) | Circuit Court of |
| v. | ) | Lee County |
| ERIC McGHEE, | ) | No. 20CF202 |
| Defendant-Appellant. | ) | |
| | ) | |
| | ) | Honorable |
| | ) | Jacquelyn D. Ackert, |
| | ) | Judge Presiding. |

JUSTICE TURNER delivered the judgment of the court.
Justices Cavanagh and Zenoff concurred in the judgment.

**ORDER**

¶ 1     *Held*:  The appellate court affirmed in part and remanded with directions, concluding
(1) the evidence was sufficient to convict defendant of official misconduct and
(2) defendant's convictions for aggravated battery and official misconduct
violated the one-act, one-crime doctrine.

¶ 2         Defendant, Eric McGhee, appeals from his convictions for aggravated battery

(720 ILCS 5/12-3.05(c) (West 2020)) and official misconduct (720 ILCS 5/33-3(a)(2) (West

2020)) following a bench trial. On appeal, defendant argues (1) the State failed to prove him

guilty of official misconduct beyond a reasonable doubt and (2) alternatively, his convictions

violate the one-act, one-crime doctrine. The State argues the evidence was sufficient to convict

defendant of official misconduct beyond a reasonable doubt and his convictions do not violate

the one-act, one-crime doctrine. We conclude (1) the State's evidence was sufficient to convict

defendant of official misconduct and (2) defendant's convictions violate the one-act, one-crime doctrine. We affirm in part and remand to the trial court with directions that it determine which of defendant's convictions to vacate as the less serious offense.

¶ 3                                I. BACKGROUND

¶ 4                            A. Defendant's Charges

¶ 5        In August 2020, the State charged defendant by information with one count of aggravated battery, a Class 3 felony (720 ILCS 5/12-3.05(c) (West 2020)) (count I), one count of official misconduct, a Class 3 felony (720 ILCS 5/33-3(a)(2) (West 2020)) (count II), and one count of abuse of a long-term health care facility resident, a Class 3 felony (720 ILCS 12-4.4a(a)(2) (West 2020)) (count III). Count I alleged defendant committed aggravated battery in that he, "in committing a battery ***, and while L.M. (07/22/1966) was at the Jack Mabley Developmental Center [Jack Mabley], a public property, did knowingly cause physical contact of an insulting or provoking nature, in that said defendant picked up L.M. from a wheelchair and threw L.M. onto a toilet." Count II alleged defendant committed official misconduct in that "defendant, a public employee, a Mental Health Technician at [Jack Mabley] , an Illinois Department of Human Services facility, while acting in his official capacity, knowingly performed an act which he knew was forbidden by law to perform, in that he committed the offense of Battery ***, by picking up L.M. (07/22/1966) from a wheelchair and throwing L.M. onto a toilet, causing insulting or provoking contact." In March 2021, the State filed a motion to voluntarily dismiss count III, which the trial court allowed.

¶ 6                                B. Bench Trial

¶ 7        After waiving his right to a jury trial, on March 21, 2022, defendant proceeded to a bench trial on counts I and II. The relevant evidence adduced at trial follows.

¶ 8                                    1. *State's Case-in-Chief*

¶ 9                                    a. Jacquelynn Washington

¶ 10          Jacquelynn Washington testified she was employed as a certified nursing assistant (CNA) with the staffing agency Maxim Healthcare (Maxim). On June 9, 2020, Maxim had assigned Washington to work as a "home health aide," which was "basically CNA work," at a facility in Dixon, Illinois (later identified as Jack Mabley). The facility was comprised of various residential buildings, which housed developmentally disabled persons. On that evening, Washington was to work from 7 p.m. to 7 a.m. and was assigned to a residence which housed women. Washington had worked at that residence on several other occasions and testified it contained around 7 to 10 bedrooms and housed between seven or eight residents at the time.

¶ 11          Washington testified L.M. was a resident at this facility. Washington identified a photograph of L.M. and agreed it adequately depicted the way L.M. looked on June 9, 2020, with the exception that when Washington met her, she "was in a recliner, and she had on a boot." L.M.'s boot was a type commonly used for medical purposes. When asked to describe L.M., Washington stated, "She was confused. She did not say much. She slept a lot. She was a two-person assist. She needed help eating and for evening snack." Washington clarified that a "[t]wo-person assist means you need two CNAs to assist the persons, as far as mobility-wise, to the washroom, to the bed." Washington testified defendant, whom she had not met before June 9, 2020, was also working at the facility that night. Defendant was a "regular staff member" of the facility who was specifically assigned to L.M. as an "assistant or CNA."

¶ 12          That evening, defendant asked Washington to assist him in taking L.M. to the bathroom and putting her to bed. L.M. was in a wheelchair, and defendant and Washington brought her into the bathroom. Washington testified, "I remember him taking—[defendant]

taking [L.M.]'s shirt off. I remember him taking her boot off, [and] throwing it towards the wall." After removing the rest of her clothing, defendant then "pick[ed] [L.M.] up by the arms and kind of thr[ew] her on the toilet." Washington explained, "[I]t wasn't like a stand, pivot, which as a CNA we learn. It was like, a stand, pivot, throw because there's a bar right there, and she kind of hit the bar, and he kind of fixed her to sit on the toilet."

¶ 13　　　　After L.M. was seated on the toilet, defendant then began to "spray her with the shower hose," which Washington had never seen before. Washington testified, "As he was showering her he began to say derogatory things towards her. Basically said, [']No man will ever want you with your stuff smelling like that,['] and he's spraying her and kind of laughing." When defendant allegedly said this, he was showering her vaginal area. While defendant continued to shower L.M., Washington briefly left to get towels. Washington and defendant dressed L.M. and returned her to her wheelchair.

¶ 14　　　　Afterwards, Washington went to the facility's main office to report what she observed to the supervisor. Washington worked at the facility one other time, after which the facility ceased working with Maxim.

¶ 15　　　　　　　　　　b. Sergeant Kyle Bocka

¶ 16　　　　Sergeant Kyle Bocka of the Illinois State Police also testified for the State. Sergeant Bocka testified his job was to investigate state employees in the executive branch who are accused of committing crimes on state time. According to Sergeant Bocka, Jack Mabley is an assisted living facility in Dixon, Illinois, and houses people with physical and mental disabilities. The facility is owned by the State of Illinois under the purview of the Illinois Department of Human Services (DHS) and staffed by both state employees and contractors.

¶ 17          In Sergeant Bocka's role, he investigated defendant in connection with the events in this case. Sergeant Bocka interviewed defendant at the Dixon police station and informed him he was accused of abuse. Defendant did not recall having any negative interactions with Washington and could not provide a reason why she might make allegations against defendant if they were untrue. Defendant's version of events was mostly consistent with Washington's, with the exception of his "throwing or hip tossing [L.M.] onto the toilet or onto the bed," which defendant denied.

¶ 18          The State rested, and defendant moved for a directed verdict. The trial court denied the motion, and defendant proceeded with his evidence.

¶ 19                              2. *Defendant*

¶ 20          Defendant testified on his own behalf. On June 9, 2020, defendant was employed at Jack Mabley as a mental health technician I. He had worked there since approximately October 2019. In his role, he "provide[d] direct care for individuals such as toileting, showers and feeding and bathing and things of *** that sort." He had provided care to L.M. once before June 9 and knew she was a "two-person assist."

¶ 21          That night, defendant requested Washington's assistance with taking L.M. to the bathroom to shower. According to defendant, it took Washington "about five minutes to respond," and "it appeared that she had an attitude because she didn't want to assist *** with putting [L.M.] in the [wheel]chair." Washington was "sitting there playing on her phone." L.M. needed to use a wheelchair because "she had a boot on" and was not able to walk on her own. After entering the bathroom, defendant recalled removing L.M.'s clothes and boot but did not recall throwing the boot. Defendant and Washington performed a two-person assist, which involved lifting her from her underarms and pivoting to place her on the toilet. Defendant then

lathered and showered L.M. but denied making any comments to her about smelling or regarding her vaginal area. Defendant also denied "throwing" L.M. from the wheelchair onto the toilet seat. According to defendant, he had been trained to bathe "large" residents on the toilet rather than in the shower.

¶ 22      On cross-examination, defendant agreed he was a state employee and Jack Mabley was under the purview of DHS. When asked why Washington might have reason to "make up" allegations against defendant, defendant responded that Washington "didn't want to help" him because she had been chatting with her colleagues and playing on her phone.

¶ 23                          3. *Verdict and Posttrial Motion*

¶ 24      Following arguments, the trial court found defendant guilty of both aggravated battery and official misconduct as alleged in counts I and II of the information. Specifically, the trial court found Washington's testimony to be credible and that defendant's "[t]hrowing" L.M. onto the toilet was "insulting or provoking in this instance."

¶ 25      On December 2, 2021, defendant filed a motion for judgment of acquittal notwithstanding the verdict, arguing, among other things, the State failed to prove defendant guilty of aggravated battery and official misconduct beyond a reasonable doubt. Following a March 21, 2022, hearing, the trial court denied defendant's motion. Defendant was sentenced to 30 months' probation on both counts and 90 days in the county jail, which was stayed subject to diminution. Defendant was further ordered not to have contact with L.M. or work in any capacity with vulnerable persons with developmental disabilities.

¶ 26      On May 3, 2022, defendant filed a motion for leave to file a late notice of appeal, which this court granted. On May 6, 2022, defendant filed a late notice of appeal in sufficient

compliance with Illinois Supreme Court Rule 606(c) (eff. July 1, 2017). Thus, we have jurisdiction of defendant's appeal under Illinois Supreme Court Rule 603 (eff. Feb. 3, 2013).

¶ 27    This appeal followed.

¶ 28                                    II. ANALYSIS

¶ 29    On appeal, defendant argues the State failed to prove him guilty of official misconduct beyond a reasonable doubt and his conviction should be vacated. Alternatively, defendant argues his convictions for both official misconduct and aggravated battery violate the one-act, one-crime doctrine. In the event this court agrees with his alternative argument, defendant contends this court should remand the case for the trial court to vacate whichever of defendant's convictions it determines is the less serious offense. The State argues the evidence was sufficient to convict defendant of official misconduct and his convictions do not violate the one-act, one-crime doctrine. We conclude the evidence was sufficient to convict defendant of official misconduct but find his convictions violate the one-act, one-crime doctrine.

¶ 30                          A. Sufficiency of the Evidence

¶ 31    We first address defendant's argument the evidence was insufficient to convict him of official misconduct because the State failed to prove he acted within his "official capacity" beyond a reasonable doubt. The State argues it proved defendant acted within his official capacity and therefore his conviction should be affirmed. We agree with the State.

¶ 32    Our supreme court has set forth the following standard of review for insufficiency of the evidence claims:

> "When considering a challenge to the sufficiency of the evidence, a reviewing
>
> court must determine whether, viewing the evidence in the light most favorable to
>
> the State, any rational trier of fact could have found the required elements beyond

- 7 -

a reasonable doubt. [Citation.] [I]t is not the function of this court to retry the defendant. [Citation.] All reasonable inferences from the evidence must be drawn in favor of the prosecution. [I]n weighing evidence, the trier of fact is not required to disregard inferences which flow normally from the evidence before it, nor need it search out all possible explanations consistent with innocence and raise them to a level of reasonable doubt. [Citation.] We will not reverse the trial court's judgment unless the evidence is so unreasonable, improbable, or unsatisfactory as to create a reasonable doubt of the defendant's guilt. [Citation.]" (Internal quotation marks omitted.) *People v. Newton*, 2018 IL 122958, ¶ 24, 120 N.E.3d 948.

¶ 33     Under section 33-3(a)(2) of the Criminal Code of 2012 (Criminal Code) (720 ILCS 5/33-3(a)(2) (West 2020)), "[a] public officer or employee or special government agent commits misconduct when, in his official capacity or capacity as a special government agent, he or she *** [k]nowingly performs an act which he knows he is forbidden by law to perform."

¶ 34     In this case, defendant concedes he committed aggravated battery but argues the State failed to prove the element that he used his position, *i.e.*, acted in his "official capacity," to further the commission of that crime. "[A]n act is performed in one's official capacity if it is accomplished by exploitation of his position as a public officer or employee." (Internal quotation marks omitted.) *People v. Selby*, 298 Ill. App. 3d 605, 615, 698 N.E.2d 1102, 1109 (1998). The First District has explained this element as follows:

"[T]he key to proving a conviction for official misconduct is that the alleged perpetrator actively used his or her position or official status to '[k]nowingly perform an act which he knows he is forbidden by law to perform.' [Citation.] In

other words, it's not enough that a defendant commits a crime when acting in an official capacity; he must also use the very fact of his authority or position to further the commission of that crime." *People v. Brogan*, 352 Ill. App. 3d 477, 491-92, 816 N.E.2d 643, 655-66 (2004).

¶ 35 Here, the evidence supports a finding defendant used his position as a mental health technician to further the commission of the aggravated battery against L.M. Defendant contends he did not use his position to gain special access to L.M., but rather merely "committed a battery while on duty as a state employee." On the contrary, defendant only had access to L.M. *by virtue of* his employment as a mental health technician at a facility operated by DHS. Washington specifically testified that contract workers such as herself were not permitted one-on-one access with the "more developmentally challenged persons" such as L.M. But for defendant's state employment, he would not have had occasion to commit the aggravated battery. Defendant himself testified his duties as a mental health technician included bathing and toileting residents. As alleged in the information, the act which constituted the aggravated battery in this case was that defendant "picked up L.M. from a wheelchair and threw L.M. onto a toilet." Defendant directly used his job responsibility of toileting L.M. as a means to commit the act of throwing her from the wheelchair onto the toilet. We conclude defendant's status as a public employee was integral to the offense of aggravated battery in this case, and the State therefore proved he acted in his official capacity beyond a reasonable doubt.

¶ 36                                  B. One-Act, One-Crime Doctrine

¶ 37 Alternatively, defendant argues his convictions for both aggravated battery and official misconduct violate the one-act, one-crime doctrine. Defendant further argues this court should remand to the trial court with directions to vacate whichever of his two convictions it

deems is the lesser offense. Defendant acknowledges he forfeited this issue by failing to raise it at trial or in a posttrial motion. Defendant nonetheless argues we should review the issue for plain error. The State argues no plain error occurred because defendant's convictions do not violate the one-act, one-crime doctrine. We agree with defendant.

¶ 38                                    1. *Plain Error*

¶ 39            The plain-error doctrine permits a reviewing court to consider unpreserved error under the following two scenarios:

> "(1) a clear or obvious error occurred and the evidence is so closely balanced that
> the error alone threatened to tip the scales of justice against the defendant,
> regardless of the seriousness of the error, or (2) a clear or obvious error occurred
> and that error is so serious that it affected the fairness of the defendant's trial and
> challenged the integrity of the judicial process, regardless of the closeness of the
> evidence." *People v. Sargent*, 239 Ill. 2d 166, 189, 940 N.E.2d 1045, 1058 (2010).

¶ 40            The first step in conducting a plain-error analysis is to determine whether any error occurred at all. *People v. Merriweather*, 2022 IL App (4th) 210498, ¶ 25. If error occurred, the court then considers whether the defendant has satisfied his persuasive burden under either of the two prongs. *Merriweather*, 2022 IL App (4th) 210498, ¶ 25. "If the defendant fails to meet his or her burden of persuasion, the reviewing court applies the procedural default." *Merriweather*, 2022 IL App (4th) 210498, ¶ 25.

> "An alleged one-act, one-crime violation is reviewable under the second prong of
> the plain-error doctrine because it affects the integrity of the judicial process.
> [Citation.] Although the one-act, one-crime rule is not of constitutional
> dimension, its purpose is to prevent the prejudicial effect that could result in those

- 10 -

instances where more than one offense is carved from the same physical act." (Internal quotation marks omitted.) *People v. Wiley*, 2022 IL App (4th) 210283, ¶ 52.

¶ 41                    2. *Whether Error Occurred*

¶ 42        As stated above, we must first determine whether error occurred—*i.e.*, whether defendant's convictions violate the one-act, one-crime doctrine.

¶ 43        "The one-act, one-crime rule prohibits convictions for multiple offenses that are based on precisely the same physical act." *People v. Smith*, 2019 IL 123901, ¶ 13, 155 N.E.3d 396. "The first step in this analysis requires us to determine whether the defendant's conduct was a single physical act or multiple acts." *People v. Kotero*, 2012 IL App (1st) 100951, ¶ 20, 978 N.E.2d 315. For the purpose of the one-act, one-crime rule, our supreme court has defined an "act" as "any overt or outward manifestation which will support a different offense." *People v. King*, 66 Ill. 2d 551, 566, 363 N.E.2d 838, 844-45 (1977). "[I]f a defendant commits multiple acts, then multiple convictions may stand, provided that none of the offenses are lesser-included offenses." *Kotero*, 2012 IL App (1st) 100951, ¶ 19. We review an alleged violation of the one-act, one-crime rule *de novo*. *Smith*, 2019 IL 123901, ¶ 15.

¶ 44        In determining whether defendant's conduct was a single physical act or multiple acts, we find the First District's decisions in *Kotero*, 2012 IL App (1st) 100951, and *People v. Moshier*, 312 Ill. App. 3d 879, 728 N.E.2d 822 (2000), to be instructive.

¶ 45        In *Moshier*, the defendant, who was a township supervisor, was charged with theft and official misconduct after stealing $100,000 from his municipal employer. *Moshier*, 312 Ill. App. 3d at 881. Upon his conviction for both offenses, the defendant sought vacatur of his official misconduct conviction based upon the one-act, one-crime doctrine. *Moshier*, 312 Ill.

- 11 -

App. 3d at 880. The First District agreed, concluding that because both counts of the indictment were based on the same act (*i.e.*, "converting 'certain checks and money *** having a total value in excess of $100,000' "), defendant was entitled to vacatur of his official misconduct conviction. *Moshier*, 312 Ill. App. 3d at 882.

¶ 46 Similarly, in *Kotero*, 2012 IL App (1st) 100951, ¶ 3, the defendant, a village parking enforcement officer, was charged with five counts of theft and official misconduct after he "allegedly told several people whose vehicles had been booted that if they paid him a certain amount of money in cash, then he would arrange to have the boot removed from their cars." The defendant was found guilty of all counts and appealed, arguing his convictions for both theft and official misconduct violated the one-act, one-crime doctrine. *Kotero*, 2012 IL App (1st) 100951, ¶ 1. The First District again agreed with the defendant. *Kotero*, 2012 IL App (1st) 100951, ¶ 26. In concluding the defendant's convictions violated the one-act, one-crime doctrine, the First District specifically looked to the charging instruments, noting, "[t]he official misconduct and aggregated theft charges were based on the same physical act, which was stealing money over a two-month period that belonged to the Village." *Kotero*, 2012 IL App (1st) 100951, ¶¶ 22-26.

¶ 47 Like the *Moshier* and *Kotero* courts, we look to the charging instruments to determine whether defendant's aggravated battery and official misconduct convictions were based on the same "act."

¶ 48 As charged in this case, aggravated battery under section 12-3.05(c) of the Criminal Code (720 ILCS 5/12-3.05(c) (West 2020)) occurs when a person, "in committing a battery, other than by the discharge of a firearm, he or she is or the person battered is on or about a *** public property." In the information, the State alleged defendant committed this offense in

that he, "in committing a battery in violation of 720 ILCS 5/12-3(a)(2), and while L.M. (07/22/1966) was at [Jack Mabley], a public property, did knowingly cause physical contact of an insulting or provoking nature, in that said defendant picked up L.M. from a wheelchair and threw L.M. onto a toilet."

¶ 49        As stated *supra*, official misconduct under section 33-3(a)(2) of the Criminal Code occurs when a public employee, "in his official capacity ***, [k]nowingly performs an act which he knows he is forbidden by law to perform." 720 ILCS 5/33-3(a)(2) (West 2020). When charging official misconduct under this section, the State is required to specify in the charging instrument the law allegedly violated by the public employee. See *Kotero*, 2012 IL App (1st) 100951 (stating the same under a prior version of the official misconduct statute); see also *People v. Williams*, 239 Ill. 2d 119, 127-28, 940 N.E.2d 50, 56 (2010) ("We have since repeated that conclusion, holding an indictment charging official misconduct must, at a minimum, allege facts that would show defendant violated an identifiable statute, rule, regulation, or tenet of a professional code." (Internal quotation marks omitted.)).

¶ 50        As charged in this case, the State alleged defendant committed official misconduct in that he, "a public employee, a Mental Health Technician at [Jack Mabley], an Illinois Department of Human Services facility, while acting in his official capacity, knowingly performed an act which he knew was forbidden by law to perform, in that he committed the offense of Battery in violation of 720 ILCS 5/12-3(a)(2), by picking up L.M. (07/22/1966) from a wheelchair and throwing L.M. onto a toilet, causing insulting or provoking contact."

¶ 51        Here, we conclude defendant's convictions for both aggravated battery and official misconduct cannot stand because they are both based solely on the same act of picking up L.M. from a wheelchair and throwing her onto a toilet, causing insulting or provoking

contact. Although the State argues defendant's conduct "consisted of multiple acts" because he threw L.M. twice, removed her clothes roughly, and "sprayed L.M.'s genitals with the showerhead while laughing and making derogatory comments about her," these additional acts were not charged in the information.

¶ 52　　　　The State further argues that even if we focus solely on the charging instruments, "defendant's conduct still consisted of multiple acts," because he (1) picked L.M. up and (2) threw her onto the toilet. We agree with defendant this argument fails under our supreme court's decision in *People v. Crespo*, 203 Ill. 2d 335, 343, 788 N.E.2d 1117, 1122 (2001). There, the supreme court held that a single attack in which three stab wounds were inflicted could not support convictions for both armed violence and aggravated battery where the State did not argue at trial that each stab wound supported a separate offense, but rather portrayed the defendant's conduct as a single attack. *Crespo*, 203 Ill. 2d at 344-45. Here, similarly, the State treated defendant's conduct of (1) picking L.M. up from her wheelchair and (2) throwing her onto the toilet as "a single attack" and made no attempt to apportion each action as a different crime in charging defendant. Because the State chose to charge both counts based on the same "single attack," we conclude multiple convictions are improper.

¶ 53　　　　In concluding defendant's convictions violate the one-act, one-crime doctrine, we find second-prong plain error occurred. See *Wiley*, 2022 IL App (4th) 210283, ¶ 52.

¶ 54　　　　To remedy a violation of the one-act, one-crime doctrine, "sentence should be imposed on the more serious offense and the less serious offense should be vacated." *People v. Artis*, 232 Ill. 2d 156, 170, 902 N.E.2d 677, 686 (2009). "In determining which offense is the more serious, a reviewing court compares the relative punishments prescribed by the legislature for each offense." *Artis*, 232 Ill. 2d at 170. "However, in situations where the degree of the

offenses and their sentencing classifications are identical, [the supreme] court has also considered which of the convictions has the more culpable mental state." *Artis*, 232 Ill. 2d at 170-71. "[W]hen it cannot be determined which of two or more convictions based on a single physical act is the more serious offense, the cause will be remanded to the trial court for that determination." *Artis*, 232 Ill. 2d at 177.

¶ 55        In this case, it cannot be determined which of defendant's two challenged convictions is the more serious offense. Both offenses are Class 3 felonies subjecting defendant to the same range of penalties. See 720 ILCS 5/12-3.05(h) (West 2020) (classifying aggravated battery as a Class 3 felony); see also 720 ILCS 33-3(c) (West 2020) (classifying official misconduct as a Class 3 felony). Additionally, both offenses required defendant to act "knowingly," and thus required the same mental state. Under these circumstances, we remand the matter to the trial court for a determination of which offense should be vacated under the one-act, one-crime rule. See *Artis*, 232 Ill. 2d at 177.

¶ 56                                III. CONCLUSION

¶ 57        For the reasons stated, we remand to the trial court with directions that it determine which of defendant's two convictions to vacate as the less serious offense pursuant to the one-act, one-crime rule. We otherwise affirm the trial court's judgment.

¶ 58        Affirmed in part; cause remanded with directions.