2025 IL App (4th) 241402-U

NO. 4-24-1402

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

NOTICE
This Order was filed under
Supreme Court Rule 23 and is
not precedent except in the
limited circumstances allowed
under Rule 23(e)(1).

FILED
October 6, 2025
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| Plaintiff-Appellee, | ) | Circuit Court of |
| v. | ) | Livingston County |
| ARNEZ J. McCORKLE, | ) | No. 23CF439 |
| Defendant-Appellant. | ) | |
| | ) | Honorable |
| | ) | Jennifer H. Bauknecht, |
| | ) | Randy A. Yedinak, |
| | ) | Judges Presiding. |

JUSTICE ZENOFF delivered the judgment of the court.
Justices Lannerd and Knecht concurred in the judgment.

**ORDER**

¶ 1     *Held*: The appellate court affirmed defendant's convictions of aggravated battery, as (1) the State proved the elements of the offenses beyond a reasonable doubt and (2) the trial court did not err in allowing defendant to proceed *pro se* without a fitness hearing.

¶ 2     Defendant, Arnez J. McCorkle, was convicted by a jury of two counts of aggravated battery against a correctional institution employee performing his official duties (720 ILCS 5/12-3.05(a)(3)(i), (d)(4)(i) (West 2022)). The trial court sentenced defendant to 15 years in prison on count II. Defendant appeals, arguing that (1) the State failed to prove that the correctional officer was executing his official duties and (2) the court erred in allowing him to proceed *pro se* without a fitness hearing. For the following reasons, we affirm.

¶ 3                                    I. BACKGROUND

¶ 4     In December 2023, defendant was charged with aggravated battery of a correctional

officer engaged in the performance of his official duties relating to events on December 8, 2022 (720 ILCS 5/12-3.05(d)(4)(i) (West 2022)). In April 2024, defendant was charged in a supplemental information with a second count of aggravated battery to a correctional officer, alleging great bodily harm, pertaining to the same events (720 ILCS 5/12-3.05(a)(3)(i) (West 2022)).

¶ 5        On January 25, 2024, defendant was arraigned and requested an attorney. On March 27, 2024, defendant appeared with counsel and entered a plea of not guilty. On June 20, 2024, defendant filed two *pro se* motions: (1) a motion to proceed *pro se* due to ineffective assistance of counsel and (2) a motion to dismiss the charges. In the motion to proceed *pro se*, defendant stated that his attorney declined to file a motion to dismiss on his behalf and told him he was "delusional." Defendant stated that he did not trust his attorney and thought she was "trying to 'swap' him out" by "agree[ing] to give someone else she represents a lesser sentence in exchange to give [him] a higher sentence." He expressed his beliefs that "[e]veryone in the world is against [him]," he had a "better chance" representing himself than "allowing someone else to play with [his] freedom," and that his attorney was "the Devil," "evil," and "want[ed] to sell [his] Freedom For money." His motion to dismiss alleged that "[t]he Charge does not state an offense," "[t]he indictment is based solely upon the testimony of an incompetent witness" who did not directly witness the battery, the victim was not engaged in the performance of his official duties and was not a peace officer, and defendant did not commit an aggravated battery on a correctional employee engaged in his official duties.

¶ 6        On June 21, 2024, the trial court, Judge Jennifer H. Bauknecht presiding, addressed defendant's motions. Defendant told the court,

"I would like to proceed *pro se* because I asked [my attorney] to file my motion to

dismiss; and she stated that she do not file a motion to dismiss. So, I feel like she doesn't want to see me go home; and I just don't want her to be representing me anymore. I feel better, comfortable representing myself than she representing me." The court explained to defendant that his attorney was bound by ethical rules and could not bring a motion without a good faith basis. Defendant stated, "I understand a little bit more, but I still feel comfortable representing myself."

¶ 7 The trial court then asked defendant a series of questions related to his desire to proceed *pro se*.

"THE COURT: How old are you?

THE DEFENDANT: 25.

THE COURT: And what is your highest level of education?

THE DEFENDANT: Tenth grade. I got my G.E.D.

THE COURT: G.E.D., okay. And so, can you read and write?

THE DEFENDANT: Yes, ma'am.

\*\*\*

THE COURT: And have you ever represented yourself before?

THE DEFENDANT: In a civil suit I have.

THE COURT: Okay. And did that, was there a trial?

THE DEFENDANT: No, ma'am.

THE COURT: Okay. And have you ever been involved in a trial before?

THE DEFENDANT: No, ma'am.

THE COURT: Okay. Civil cases are much different than criminal, you understand it's completely different rules that apply to procedure and evidence, you

understand that?

THE DEFENDANT: Yes, ma'am.

THE COURT: And have you ever been institutionalized for a mental-health disorder?

THE DEFENDANT: Yes, ma'am.

THE COURT: And when was the last time that happened, do you know?

THE DEFENDANT: Honestly, I currently take psychotropic medications—

THE COURT: Okay.

THE DEFENDANT: —for different things.

THE COURT: All right. And do you know specifically what medications you're taking?

THE DEFENDANT: Zypreza, Zoloft, clonidine, I think that's the name of it for impulse disorder—

THE COURT: Uh-huh.

THE DEFENDANT: —and I take Remeron to help me sleep.

THE COURT: Okay. And do you have side effects from those medications?

THE DEFENDANT: Yes, ma'am. The side effects, it's, like, more physically, like, my body gaining weight, things of that nature.

THE COURT: Any [*sic*] does it interfere at all with your focus or your ability to make decisions?

THE DEFENDANT: At times it does, but not recently since I've been complying with it. It only happens when I'm not complying with my medications.

THE COURT: So, when you sometimes take it, sometimes don't?

- 4 -

THE DEFENDANT: Yes, ma'am.

THE COURT: Or if you don't take it, then you're not thinking clearly?

THE DEFENDANT: Yes, ma'am.

THE COURT: So, as long as you're taking the medication, you're fine, as far as making decisions?

THE DEFENDANT: Yes, ma'am.

THE COURT: The reason I'm asking these questions is because today, if you want to represent yourself, I have to decide not whether it's a good idea or a bad idea, but I need to decide whether or not you are knowingly and intelligently waiving your right to have an attorney represent you?

THE DEFENDANT: Yes, ma'am.

THE COURT: So, your attorney is versed in the law, she would understand the different rules of evidence. You are basically going to be on your own. If you haven't had any legal training, it's going to be a lot more difficult, and I'll go through that with you in a moment; but I have to make sure that you are knowingly and intelligently waiving your right to an attorney. So, any questions about your decision making today?

THE DEFENDANT: No, ma'am."

¶ 8     The trial court then admonished defendant about the two charges against him, the State's allegations, and the possible penalties for each charge. Defendant confirmed his understanding of each. The court then went into detail about the advantages of being represented by a lawyer and the disadvantages of representing himself. Defendant confirmed that he understood, had no questions, and still wished to proceed *pro se*. The court found that he

knowingly and voluntarily waived his right to counsel, and it vacated the appointment of the public defender.

¶ 9　　　　The trial court then turned to the State's motion to continue based on the unavailability of one of the witnesses. Defendant indicated that he objected because the witness in question was incompetent and not material. The court granted the motion. Defendant continued to object, arguing that the underlying incident occurred two years prior and the witness lied to the court during the arraignment. The court directed him to cross-examine and impeach the witness on those matters at trial.

¶ 10　　　　On July 11, 2024, the trial court held a hearing on defendant's motion to dismiss, defendant stated that he did not have any additional argument to present, as he "put the main things" in the motion. The State argued that defendant's motion was not well-founded, as it merely contested the sufficiency of the evidence, which was a trial issue. The court agreed, expressed its belief that defendant had "a misunderstanding as to the law," and denied the motion.

¶ 11　　　　The jury trial was held on August 12, 2024. Before trial began, the trial court, Judge Randy A. Yedinak presiding, asked defendant if he was continuing to represent himself. Defendant confirmed he was but asked if the court could appoint someone to help him with legal terms. The court refused to appoint standby counsel. Defendant again confirmed that he would proceed *pro se*. The court informed defendant of the general structure of the trial and the process of selecting jurors.

¶ 12　　　　The trial court then called in the prospective jurors and began *voir dire*. The State asked the venire whether any of them knew someone who worked at the Pontiac Correctional Center. When it was his turn, defendant stated to the venire, "Raise your hand, first off, no one is—right? Raise your hand if—*** no one is a robot? Got to make sure no one is a robot. Raise

your hand if no one is a robot." He then asked if any prospective jurors were related to anyone who worked at Pontiac Correctional Center. He indicated that those were the only questions he had. During jury selection, he used peremptory challenges against two prospective jurors who indicated they knew the prosecutor or had a relative employed at Pontiac Correctional Center.

¶ 13         In his opening statement, defendant asserted that his "client" did not commit the crime and the correctional officer who was the victim in this case was not engaged in the performance of his official duties at the time of the crime.

¶ 14         John Cimadomo, the State's first witness, testified that he was a gallery officer at Pontiac Correctional Center. As a gallery officer, he received daily assignments, which ranged from giving inmates passes for activities, bringing them meals, and ensuring inmates were where they were supposed to be throughout the day. He reported to his sergeant, who reported to a lieutenant, who in turn reported to a house major and shift commander.

¶ 15         Cimadomo testified that on December 8, 2022, his sergeant instructed him that defendant was to clean the shower cell. Cimadomo went to defendant's cell and "asked him if the sergeant had spoken to him about cleaning the shower cell and if he was still willing to do that." Defendant said he was. Cimadomo then went to his sergeant, who unlocked the cleaning supply room to obtain the appropriate supplies. Cimadomo placed these supplies in the shower cell. He then secured defendant with handcuffs and escorted him to the shower cell. Once defendant was in the cell, Cimadomo closed the cell door and uncuffed defendant through the "cuffing hatch" on the side of the door.

¶ 16         Cimadomo testified that he completed another task while defendant was cleaning the shower cell and returned once defendant had finished. Cimadomo asked defendant to turn around and face away from him so he could cuff him through the door. However, Cimadomo was

only able to cuff one hand because defendant was holding a soap dish and a rag in his other hand. Cimadomo asked defendant to put them down but was still unable to completely cuff his other hand, so he asked defendant to remain facing away from him while he opened the door "to just reach in and give it another click." When Cimadomo opened the door, however, defendant "spun toward [him] and pushed past [him] and then started walking down the gallery," ignoring Cimadomo's commands to stop. Defendant eventually stopped after two or three commands. Cimadomo then walked toward him and reached for his wrist. Cimadomo testified, "[T]he next thing I remember after that is, I'm on the ground and [defendant] is standing over me screaming and delivering punches to my head and face." He testified that he did not recall striking defendant; all he remembered was that his "hands were up" and he was "trying to reach [his] radio." Cimadomo was eventually able to reach his radio but was unable to stop defendant on his own.

¶ 17    Cimadomo testified that he "suffered a broken nose," had damaged soft tissue in his face, and had blood in his eyes. As a result of his injuries, (1) his eyes and vision will degenerate faster than they would have, (2) he had a metal plate in his neck from a cervical spinal fusion, (3) he had complete hearing loss in his right ear, (4) he had scarring on his brain, which affected his memory and speech, (5) he developed balance issues, (6) he had neuropathy and "burning nerve pain almost constantly," and (7) he had damage to his lower back, causing "bulging disks." He was unable to return to work until February 14, 2024, and had been on "limited duty or light duty" since that time. On the State's motion and without objection, the trial court admitted photographs of Cimadomo's injuries taken directly after the incident.

¶ 18    On cross-examination by defendant, Cimadomo testified that he was written up for negligence and breach of security for the incident. He stated that he brought defendant out of his cell even though the facility was experiencing a level 1 lockdown because his "sergeant ordered

[him] to get [defendant] out of the cell," though he did not "know what [the sergeant] was thinking or what his reasoning was." Cimadomo knew defendant was designated as a "Level E, high-escape-risk individual." He testified that the correctional center's regulations dictated that "[i]ndividuals in custody on a Level 1 lockdown, assuming that we are not given other orders, remain in their cell unless there is a medical emergency." Cimadomo explained that he did not agree with the order to remove defendant from his cell, but "it was the order that [he] was given." Defendant attempted to introduce an exhibit of his own injuries from that day, but the trial court sustained the State's objection as to lack of foundation.

¶ 19          Officer John Thorp testified next. He had been working at Pontiac Correctional Center for almost 11 years. On December 8, 2022, his attention was drawn to the sound of keys rustling, and he ran upstairs and saw Cimadomo, who "didn't look good." Thorp then observed that defendant had been released. He ordered defendant to get down on the ground; when defendant complied, Thorp restrained him. Thorp did not see defendant attack Cimadomo. Defendant asked Thorp at trial why he assumed it was an assault rather than "a fight or a slip and fall?" Thorp testified it was because he "saw [Cimadomo's] face," "[defendant was] the only one on the gallery," and he "put two and two together, it was [defendant] and it was [Cimadomo]." Thorp added that Cimadomo's injuries were not consistent with a slip and fall.

¶ 20          Nikki Rambo testified next. She was the director of nursing at Pontiac Correctional Center. She was called to the cell house where Cimadomo was injured and observed him "coming down the stairs, his shirt was covered in blood, his nose was bleeding, his mouth was bleeding, and the left side of his face was beginning to swell." She testified that his injuries were "more severe" than most regular injuries. She explained that his head wound was so severe that he had to be sent to the hospital. She observed defendant immediately after the altercation, and he only had

"a small abrasion" the "size of a pencil eraser" under his left eye. She testified that the injury did not require, and defendant declined, medical intervention. Rambo stated that Cimadomo's injuries were consistent with closed-fist striking. During cross-examination, defendant attempted again to admit the photograph of himself with a black eye, but Rambo denied seeing the photograph before or seeing defendant with a black eye on December 8, 2022. The trial court again denied defendant's request to admit the photograph.

¶ 21　　　　After the State rested, the trial court excused the jury from the courtroom while the court discussed jury instructions with both parties. Defendant, who had no objection to many of the State's jury instructions, voiced an objection to two of them. The court explained that both instructions were statements of the law and would be given over defendant's objection.

¶ 22　　　　The State requested the trial court admonish defendant, before he began his testimony, about his "habit of talking about what [his] exhibits are going to show before those exhibits are admitted into evidence." The court did so, instructing defendant that he should show the State the exhibit to allow it the opportunity to object before the exhibit is discussed. Defendant indicated he understood. Before the jury returned, defendant made an oral "motion for a judgment of acquittal," which the court interpreted as a motion for a directed verdict. Defendant based his motion on "the lack of prosecution and lack of witness," stating, "There's no case, [Y]our Honor, I don't see the case." The court denied the motion. When the court asked if he had any other motions, he stated, "Yeah. I'd say what about the motion for judgment of acquittal." The court again explained the standard for a directed verdict and that credibility was a question for the jury and denied the motion.

¶ 23　　　　Defendant testified that on December 8, 2022, he "was laying in [his] cell" when Cimadomo asked if he wanted to clean the shower cell. After defendant finished cleaning the

shower, Cimadomo said to him, "[M]an, I don't understand why you're out of the cell anyway." Cimadomo tried cuffing him, and they then "got to arguing because of the situation." Defendant told him to "open the door before we get into it" and started cussing. Defendant said that Cimadomo "called [his] bluff by opening the cell," at which point defendant "told [Cimadomo] he's not worth [defendant's] freedom" and "walked past him out the cell down to his direction." Cimadomo then "called [defendant] back, told [him] to cuff up," but defendant refused, saying, "[Y]ou cuff me up, you force me, you touch me, I'm going to beat your a***." Defendant testified,

> "[Cimadomo] come down there *** and grabbed me so hard that I almost fell or I did fall. Either way, when I got up, I started hitting him with closed fist, and then he started hitting me back with closed fist; and we was engaged into a fight. And that's what happened. So, I was hitting him with closed fist and he hitting me with closed fist."

Defendant then moved to admit the photograph of himself with a black eye, which he testified was taken after the incident and accurately depicted what he looked like at the time. The State did not object, and the trial court admitted the photograph.

¶ 24            Defendant continued, explaining,

> "Now, after this situation, John Cimadomo, he fell to the ground. I no further hit him while he was on the ground. It was just I hit, it wasn't a knock-out punch or anything; I was hitting him with closed fist to his face, he was hitting me with closed fist to my face, we both engaged in a fight. He fell to the ground. I stopped, I heard someone calling my [name], which was John Thorp ***. I didn't know it was him at the time, but I heard the [correctional officer (C.O)]. calling my name. I heard another C.O. that was on the catwalk with a gun. I heard him yelling

- 11 -

my name. And then when I heard him, I seen him with a gun. So, I turned around, I started running, because I didn't want to get shot, and I dove to the ground. And then I held my hands up, and then that's when the C.O. came to cuff me up to shackle me up, and that was it. That was everything."

¶ 25 On cross-examination, defendant confirmed that he struck Cimadomo several times and that Cimadomo did not slip and fall. Defendant said he refused Cimadomo's order to cuff him because Cimadomo "wasn't in his right" and "wasn't engaged in performance of his authorized duties" because defendant was "never supposed to have been out of the cell." Defendant testified that he saw the pictures of Cimadomo's injuries and confirmed that he caused them. He characterized it as "mutual combat," not an assault or aggravated battery.

¶ 26 The State called Cimadomo as a rebuttal witness. Cimadomo testified that he did not intentionally strike defendant in the face. He stated that "[t]he only verbal interaction" that he had with defendant "before [he] was on the ground was [his] orders to stop walking away." On cross-examination, Cimadomo denied (1) arguing with defendant, (2) telling him "to stop b***" or that he was going to "call [defendant's] bluff," (3) saying any personal comments toward defendant, or (4) hearing defendant say, "[W]atch your mouth or I'm going to beat your a***."

¶ 27 Defendant presented a short closing argument, during which he claimed that he proved that he "did not commit aggravated battery to a peace officer who was engaged in the performance of his authorized duties." He stated that Cimadomo "was charged with the violations of negligence and breach of security." The State objected because defendant "misstate[d] the evidence," and the trial court sustained the objection. Defendant then briefly concluded his closing argument by instructing the jury to "bring together your notes and deliberate accordingly."

¶ 28    The jury found defendant guilty on both counts of aggravated battery. Thereafter, defendant filed six documents: (1) a notice of appeal, (2) a motion for new trial, (3) a motion for pauper appeals, (4) a motion for substitution of judge, (5) a "motion for change of place of trial," and (6) a "motion for insanity." On September 11, 2024, defendant filed a "motion to reconsider finding of guilt" and a motion for a fitness hearing. On October 11, 2024, he filed another motion for a new trial. The trial court denied defendant's motion for substitution of judge and held a hearing on his remaining motions.

¶ 29    The trial court held a hearing on October 11, 2024, to address defendant's remaining motions and sentence him. Defendant expressed his desire to have counsel appointed. The court explained that if he were appointed another attorney, it could be the same attorney he previously had. Defendant indicated he would continue representing himself.

¶ 30    The trial court denied defendant's motion "for change of place of trial." As to the motion for a fitness hearing, the court found that "there was never a *bona fide* doubt ever raised either before trial or even during trial, there was really simply nothing in the record to support this claim." The court noted that the "motion for insanity" had two attachments that were "not really labeled." One of these attachments showed that "defendant at some point was designated SMI or seriously mentally ill." However, the court stated, "I don't know what that means, I don't know what goes into that determination or how someone is labeled or even receives that designation," and it reiterated that "there's really nothing in the record *** about this defendant being found unfit before."

¶ 31    The trial court explained,

            "But most importantly, as [the State] indicated, we have the defendant's
            behavior at trial. [Defendant], I commended you at the trial for not only your

- 13 -

behavior, the fact that you were polite, \*\*\* respectful, \*\*\* during that trial and you conducted yourself very well. Again, this is not the most complicated case; but your performance and presentation in the case was better than some defense attorneys that I deal with in this courtroom. So, you had no problem understanding, at least from my viewpoint, understanding the nature of the proceedings. There were several objections in the case which you were able to adequately navigate, argue and comprehend with very little to no explanation from this Court. There was sometimes where you would indicate that you didn't understand a legal phrase or a legal term which I explained to you, and you seemed to understand perfectly. I think it's also important to note that, I'm not sure, and again, there's very little evidence, there's no evidence of any mental illness in this particular case, but at no point did you ever seem confused as if you didn't understand the nature of the proceedings against you; and the defense that you presented was a good defense from a strategic standpoint. It was one that, you know, certainly this Court recognized; unfortunately, the jury did not believe or accept it for your sake. But simply put, there's just absolutely no evidence in the record or before me of you being unfit or that there be a *bona fide* doubt as to your fitness."

¶ 32 Defendant argued he was unfit, noting he told Judge Bauknecht that he was prescribed psychiatric medications and was diagnosed with mental illnesses. The trial court disagreed and stated,

"[T]he fact that somebody may take medication to deal with mental illness does not automatically mean that they are unfit. The standard that this Court has to employ and the standard that this Court has to look at is whether this Court believes you are

unable to understand the nature of the proceedings against you, that's simply the standard; and everything I have before me indicates the opposite of that. You understand very well. In fact, you filed a number of motions here today, you're citing the appropriate statutes, you're arguing the appropriate standards."

The court denied defendant's motion for a fitness hearing, "motion for insanity," both motions for a new trial, and the motion to reconsider.

¶ 33 The trial court proceeded to the sentencing hearing. The court merged the convictions on the two counts and sentenced defendant to 15 years in prison on count II.

¶ 34 This appeal followed.

¶ 35 II. ANALYSIS

¶ 36 On appeal, defendant argues that (1) the State failed to prove beyond a reasonable doubt that Cimadomo was executing his official duties and (2) the trial court erred in allowing defendant to proceed *pro se* without a fitness hearing.

¶ 37 A. Sufficiency of the Evidence

¶ 38 When a defendant challenges the sufficiency of the evidence, we must determine whether, after viewing the evidence in the light most favorable to the State, any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *People v. Gray*, 2017 IL 120958, ¶ 35. "A criminal conviction will not be set aside on a challenge to the sufficiency of the evidence unless the evidence is so improbable or unsatisfactory that it creates a reasonable doubt of the defendant's guilt." *People v. Jackson*, 2020 IL 124112, ¶ 64.

¶ 39 It is the function of the trier of fact to determine the credibility of the witnesses, assess the weight given to their testimony, resolve conflicts in the evidence, and draw reasonable inferences from that evidence. *People v. Baker*, 2022 IL App (4th) 210713, ¶ 35. These credibility

determinations are entitled to great weight. *Baker*, 2022 IL App (4th) 210713, ¶ 35. In contrast, "[i]t is not the function of the reviewing court to retry the defendant," and thus, an appellate court will not "substitute its judgment for that of the trier of fact on issues involving the weight of the evidence or the credibility of witnesses." *Jackson*, 2020 IL 124112, ¶ 64.

¶ 40　　　　To convict defendant of aggravated battery under both counts, the State had to prove that defendant (1) committed a battery against Cimadomo, (2) knowing that he was a correctional institution employee (3) who was performing his official duties. 720 ILCS 5/12-3.05(a)(3)(i), (d)(4)(i) (West 2022). Under count II, the State also had to prove that defendant caused Cimadomo great bodily harm. 720 ILCS 5/12-3.05(a)(3)(i) (West 2022). Defendant does not contest that he punched Cimadomo in the face with closed fists, caused him great bodily harm, or knew Cimadomo was a correctional officer. Defendant argues only that Cimadomo was not performing his official duties at the time of the incident, noting Cimadomo knowingly violated the correctional center's policy and was internally sanctioned.

¶ 41　　　　Section 12-3.05 of the Criminal Code of 2012 (720 ILCS 5/12-3.05 (West 2022)) does not define "official duties." The Illinois Appellate Court, First District, has suggested that "[a]n act is performed in one's official capacity if it is accomplished by exploitation of his public position." *People v. Hampton*, 307 Ill. App. 3d 464, 477 (1999). The Fifth District, in turn, has suggested that "a peace officer is executing his 'official duties' when acting in the good faith performance of his job-related duties regardless of whether those actions are later determined to be constitutionally unreasonable." *People v. McIntosh*, 2020 IL App (5th) 170068, ¶ 57. Illinois courts have found peace officers can engage in "official duties" even when they are off-duty and employed by someone else (*People v. Barrett*, 54 Ill. App. 3d 994, 996 (1977)), and even when they perform their duty in "a flippant, insulting, and provocative manner" (*People v. Smith*, 342

Ill. App. 3d 289, 296 (2003)). The key inquiry is "the nature of the acts [the officer] performed." *Barrett*, 54 Ill. App. 3d at 996. On the other hand, officers are not engaged in an official duty when they are motivated only by personal reasons (*People v. Brogan*, 352 Ill. App. 3d 477, 492 (2004)) or the act is completely unrelated to their job duties (*People v. Webb*, 144 Ill. App. 3d 83, 87 (1986)).

¶ 42 In this case, Cimadomo was clearly engaged in job-related duties for his public position as a correctional officer when the incident occurred. He testified that as a gallery officer, he was given daily duties by his supervising officers. On the day in question, his sergeant assigned him the task of taking defendant to clean the shower cell. His sergeant unlocked the cleaning supply closet so that Cimadomo could obtain the necessary cleaning supplies. In taking defendant out of his cell to clean the shower cell, Cimadomo was performing the specific duty that he was assigned in his role as a gallery officer. On any other day, Cimadomo's conduct would be well within the realm of his official duties. On this day, however, because the facility was in a level 1 lockdown, Cimadomo's action of removing defendant from his cell was not in compliance with the facility's policy. Defendant argues that Cimadomo's knowing violation of this policy precludes a finding that he was performing his official duties. The jury reasonably rejected this argument.

¶ 43 The cornerstone of our analysis is whether Cimadomo was acting in "the good faith performance of his job-related duties." *McIntosh*, 2020 IL App (5th) 170068, ¶ 57; see *People v. Campbell*, 2021 IL App (4th) 190525-U, ¶ 19 (noting that *Smith* and *McIntosh* "demonstrate that the pertinent question is not *** whether the victim of the battery was acting in strict compliance with the rules and regulations applicable to a specific occupation" but "whether the victim was engaged in the good-faith performance of a job-related duty or solely in her own personal pursuits unrelated to any actual occupational duty"). Viewing the evidence in the light most favorable to

the State, a rational trier of fact could have found beyond a reasonable doubt that Cimadomo acted in the good faith performance of his job-related duties. The jury was not bound by the fact that Cimadomo's actions ultimately violated prison policy or that he was internally sanctioned. Case law establishes that a peace officer can execute official duties in good faith, even if "those actions are later determined to be constitutionally unreasonable." *McIntosh*, 2020 IL App (5th) 170068, ¶ 57. It follows that a peace officer can execute official duties in good faith, even if those actions are later determined to be against an internal policy.

¶ 44        Though Cimadomo acknowledged that he knew that removing defendant, a high-escape-risk individual, from his cell during a level 1 lockdown was not in compliance with the correctional facility's policies, Cimadomo also testified that the correctional center's regulations dictated that "[i]ndividuals in custody on a Level 1 lockdown, *assuming that we are not given other orders*, remain in their cell unless there is a medical emergency." (Emphasis added.) Here, he was given other orders. He thus had two conflicting duties: following his sergeant's orders and following the facility's policy. That he chose one over the other, even if he was unsure about his sergeant's rationale, does not automatically mean he was not performing his duties in good faith. There is no indication that Cimadomo had overriding personal motivations to have defendant clean the shower cell, like the officer in *Brogan*, 352 Ill. App. 3d at 492 (finding that the officer was not engaged in official duties where "the State offered no evidence to suggest that [he committed the act in question] for any other than personal reasons"), or that his conduct was unrelated to his job duties, like the acts at issue in *Webb*, 144 Ill. App. 3d at 87 (finding that the officer was not engaged in official duties when he committed perjury during his testimony about events that he witnessed while he was neither on duty nor part of the investigation).

¶ 45        An officer's actions do not have to be prudent to remain in the realm of official

duties. In *Smith*, this court noted that an officer's "duties as a correctional officer did not include calling [the defendant] insulting names, 'playing chicken' with her breakfast tray, or intimidating her with the threat of poison." *Smith*, 342 Ill. App. 3d at 296. However, because the correctional officer "committed his provocative acts while performing an actual duty of a correctional officer: delivering breakfast," he was still performing his official duties. *Smith*, 342 Ill. App. 3d at 296. We noted that the legislature could not have "intended correctional officers to become 'fair game' if they provoked inmates while performing their duties." *Smith*, 342 Ill. App. 3d at 296. As in *Smith*, we find no indication that the legislature intended correctional officers to "become 'fair game' '' for a violent assault merely because they followed their supervising officer's orders, rather than the prison's internal policies. *Smith*, 342 Ill. App. 3d at 296. There was sufficient evidence in the record to support the jury's determination that Cimadomo was performing his official duties.

¶ 46                                   B. Fitness to Proceed *Pro Se*

¶ 47            Defendant next contends that the trial court erred in allowing him to proceed *pro se* without conducting a hearing to determine his fitness to represent himself in light of his comments about taking psychiatric medication and his irrational behavior before and during trial. The State disagrees and argues that defendant forfeited this issue by failing to properly preserve it. In his reply brief, defendant contends that "[i]t would be perverse to fault [defendant] for not preserving that issue, when it is a lawyer's role to preserve issues," but if this court does find the issue forfeited, it should review it under the second prong of the plain error doctrine.

¶ 48            Invoking plain error in a reply brief adequately presents the issue for appellate review. See *People v. Resor*, 2024 IL App (4th) 230208, ¶ 50; *People v. Ramsey*, 239 Ill. 2d 342, 412 (2010). However, regardless of whether the issue was forfeited, there was no error. See *Ramsey*, 239 Ill. 2d at 445 ("[A] reviewing court will only reverse for plain error when a clear or

obvious error occurs.").

¶ 49    "A defendant has a constitutional right to represent himself." *People v. Baez*, 241 Ill. 2d 44, 115 (2011). A defendant's waiver of counsel must be knowing, intelligent, clear and unambiguous. *Baez*, 241 Ill. 2d at 116. The trial court's determination that a defendant knowingly waived the right to counsel is reviewed for an abuse of discretion. *Baez*, 241 Ill. 2d at 116. "An abuse of discretion will be found only where the court's ruling is arbitrary, fanciful, unreasonable, or where no reasonable person would take the view adopted by the trial court." (Internal quotation marks omitted.) *Baez*, 241 Ill. 2d at 106.

¶ 50    A defendant is presumed to be fit to stand trial. 725 ILCS 5/104-10 (West 2024). Under the due process clause, an unfit defendant may not be prosecuted or sentenced. *People v. Sandham*, 174 Ill. 2d 379, 382 (1996). If a *bona fide* doubt arises as to a defendant's fitness—that is, a doubt that a defendant "understand[s] the nature and purpose of the proceedings against him and [is] able to assist in his defense"—the trial court has a duty to order a fitness hearing. *Sandham*, 174 Ill. 2d at 382. "To determine whether there exists a *bona fide* doubt of a defendant's fitness, a court may consider the defendant's irrational behavior, the defendant's demeanor at trial, and any prior medical opinion on defendant's competence." *People v. Harris*, 206 Ill. 2d 293, 304 (2002). However, "there are 'no fixed or immutable signs which invariably indicate the need for further inquiry to determine fitness to proceed; the question is often a difficult one in which a wide range of manifestations and subtle nuances are implicated.' " *People v. Eddmonds*, 143 Ill. 2d 501, 518 (1991) (quoting *Drope v. Missouri,* 420 U.S. 162, 180 (1975)).

¶ 51    While defendant "does not argue there was a *bona fide* doubt as to his fitness in general," he argues that he was in a "gray-area" under *Indiana v. Edwards*, 554 U.S. 164 (2008), where he was fit for trial but unfit to represent himself. In *Edwards*, the United States Supreme

Court considered the relationship between the "mental competence standard," established under *Dusky v. United States*, 362 U.S. 402 (1960), and *Drope*, "to the right of self-representation." *Edwards*, 554 U.S. at 170. The Court found that

> "[i]n certain instances an individual may well be able to satisfy *Dusky*'s mental competence standard, for he will be able to work with counsel at trial, yet at the same time he may be unable to carry out the basic tasks needed to present his own defense without the help of counsel." *Edwards*, 554 U.S. at 175.

The Court noted that "the nature of the problem before us cautions against the use of a single mental competency standard for deciding both (1) whether a defendant who is represented by counsel can proceed to trial and (2) whether a defendant who goes to trial must be permitted to represent himself." *Edwards*, 554 U.S. at 175. The Court concluded "the Constitution permits States to insist upon representation by counsel for those competent enough to stand trial under *Dusky* but who still suffer from severe mental illness to the point where they are not competent to conduct trial proceedings by themselves." *Edwards*, 554 U.S. at 178.

¶ 52        However, *Edwards* expressly declined to adopt "a more specific standard that would 'deny a criminal defendant the right to represent himself at trial where the defendant cannot communicate coherently with the court or a jury.' " *Edwards*, 554 U.S. at 178. Rather, the Court emphasized that the trial judge "will often prove best able to make more fine-tuned mental capacity decisions, tailored to the individualized circumstances of a particular defendant." *Edwards*, 554 U.S. at 177. However, the Court did favorably reference a portion of the American Psychiatric Association's *amicus* brief, which stated, " 'Disorganized thinking, deficits in sustaining attention and concentration, impaired expressive abilities, anxiety, and other common symptoms of severe mental illnesses can impair the defendant's ability to play the significantly expanded role required

- 21 -

for self-representation even if he can play the lesser role of represented defendant.' " *Edwards*, 554 U.S. at 176.

¶ 53        Illinois courts have interpreted *Edwards* to mean "that a defendant's right to self-representation was not absolute and could be limited if a defendant was not mentally competent to proceed *pro se*, yet was still competent to stand trial with representation." *People v. Allen*, 401 Ill. App. 3d 840, 851 (2010). Despite recognizing this "gray-area," Illinois courts have repeatedly rejected the argument that *Edwards* "required the trial judge to apply a higher standard than that required to determine mental fitness to stand trial, since he was proceeding *pro se*." *Allen*, 401 Ill. App. 3d at 853; see *People v. Khan*, 2021 IL App (1st) 190679, ¶ 62; *People v. Tatum*, 389 Ill. App. 3d 656, 670 (2009); *People v. McNutt*, 2020 IL App (1st) 173030, ¶ 90; *People v. Washington*, 2016 IL App (1st) 131198, ¶ 78. Rather, our courts have concluded that

> "*Edwards* simply held that in cases where a 'gray-area' defendant has been found fit to stand trial but exhibits 'severe mental illness' that affects his or her competency to conduct trial, the trial court may consider the specific facts and circumstances of the case to determine whether that defendant is, in fact, competent to waive counsel and conduct trial on his own." *McNutt*, 2020 IL App (1st) 173030, ¶ 90.

Case law has articulated no particular standard to identify defendants who are fit to stand trial yet too severely mentally ill to represent themselves. However, in analyzing whether defendants fall into this nebulous "gray-area," Illinois courts have scrutinized whether a defendant's behavior at trial indicated severe mental illness and given significant weight to the trial court's first-hand observations. See *Khan*, 2021 IL App (1st) 190679, ¶ 63; *Allen*, 401 Ill. App. 3d at 852; *Tatum*, 389 Ill. App. 3d at 670-71; *McNutt*, 2020 IL App (1st) 173030, ¶¶ 94-95, 98-99, 102-04;

*Washington*, 2016 IL App (1st) 131198, ¶¶ 80-81.

¶ 54      Defendant points to several examples of "paranoid behavior and irrational thinking" that should have raised a concern about his fitness to represent himself: (1) his motion for self-representation indicating that his attorney was "evil," "the Devil," and "trying to 'swap' him out" by "agree[ing] to give someone else she represents a lesser sentence in exchange to give [him] a higher sentence;" (2) his statement to the trial court that he had been institutionalized for a mental health disorder and was taking psychotropic medications; (3) his question to the venire asking whether any of them were "robots;" and (4) his pursuit of "multiple contradictory theories of defense." However, we disagree that these facts—individually or taken together—demonstrate that defendant was too severely mentally ill to waive counsel and represent himself.

¶ 55      Defendant's behavior must be considered in context. To be sure, his motion for self-representation conveyed his extreme frustration and sense of injustice, and his question to the venire was strange, but neither of these facts necessarily indicate that he was suffering from a mental illness so severe as to implicate *Edwards*. The trial court had the benefit of observing defendant's conduct, demeanor, and tone of voice throughout the pretrial and trial proceedings. Our review of the record establishes that defendant was able to answer the court's questions and explain to the court coherently and politely why he wanted to represent himself. The discussions between defendant and the court consisted of articulate, clear exchanges where he was able to understand the court's explanation about his attorney's ethical responsibilities, the charges against him, the possible sentencing consequences, the benefits of being represented by an attorney, and the drawbacks of self-representation. Moreover, he used peremptory challenges logically to dismiss potential jurors who knew the prosecutor or were related to someone who worked at Pontiac Correctional Center. He was able to file motions, raise objections with at least some legal

basis, and present rational opening and closing arguments. He cross-examined witnesses, understood and followed the court's instructions to properly enter exhibits into evidence, and objected to two of the State's jury instructions. Though some of his posttrial motions were untimely—specifically, his motion for a change of venue and substitution of judge—they were based on coherent, if unmeritorious, legal arguments. In this broader context, defendant's isolated statements in his motion to represent himself and question to the venire do not support a claim that he was too severely mentally ill to represent himself. It is also important to note that the trial court, in the position of being "best able to make more fine-tuned mental capacity decisions, tailored to the individualized circumstances of a particular defendant" (*Edwards*, 554 U.S. at 177), emphasized that it did not observe in defendant's conduct any signs of mental illness or a lack of understanding of the proceedings.

¶ 56        The fact that defendant was diagnosed with mental illnesses, previously institutionalized, and taking psychotropic medications does not change this conclusion. The Code of Criminal Procedure of 1963 conclusively states that "[a] defendant who is receiving psychotropic drugs shall not be presumed to be unfit to stand trial solely by virtue of the receipt of those drugs or medications." 725 ILCS 5/104-21 (West 2024); see *Harris*, 206 Ill. 2d at 305 (stating the mere fact that a defendant suffers from mental impairments does not necessarily establish that the defendant was unfit to stand trial or plead guilty). Moreover, *Edwards* itself noted, "Mental illness itself is not a unitary concept. It varies in degree. It can vary over time. It interferes with an individual's functioning at different times in different ways." *Edwards*, 554 U.S. at 175. Because a defendant's history of mental illness and taking psychotropic medication alone does not necessarily mean he or she is currently mentally ill, the context in which his claim arises is critical.

¶ 57    In *People v. Sheley*, 2012 IL App (3d) 090933, ¶¶ 6, 12, 14, the trial court denied a defendant's motion to represent himself where (1) the defendant had an "inappropriate" courtroom outburst; (2) one expert diagnosed the defendant with an unspecified cognitive disorder, an unspecified personality disorder, and cocaine and alcohol abuse and opined that the defendant was fit to stand trial but unfit to represent himself; and (3) a second expert diagnosed the defendant with cocaine-induced hallucinations, which were in remission, and "probable" antisocial personality disorder but opined that he was fit both to stand trial and represent himself. The appellate court reversed, holding that the trial court violated the defendant's "constitutional right to forego [*sic*] the assistance of counsel" where the record failed to show that the defendant suffered from a "severe mental illness" under *Edwards* because his "courtroom demeanor also demonstrated his ability to represent himself." *Sheley*, 2012 IL App (3d) 090933, ¶¶ 25-28. Accordingly, defendant's behavior in the courtroom remains central to our analysis of his competence, regardless of a history of mental illness.

¶ 58    Here, defendant's behavior in court, as discussed above, did not raise any concerns as to his fitness. As to his medications and their impact on his functioning, the trial court extensively questioned defendant. Defendant was able to list the names of each of the four medications he was prescribed and their side effects. He explained that he did not have any issues with focusing or decision-making while he was taking the medications as prescribed, and he claimed that he was taking them as prescribed. In short, defendant's behavior gave no indication that the court should discard the presumption of his fitness. See 725 ILCS 5/104-10 (West 2024).

¶ 59    Lastly, defendant's purported pursuit of "multiple contradictory theories of defense" and "inability to mount a defense" show his lack of legal training, not a severe mental illness. Further, at trial, defendant's primary defense was that Cimadomo was not performing

official duties, which is the same defense that defendant's appellate counsel advances in challenging the sufficiency of the evidence. Thus, the record shows that defendant pursued a plausible defense while representing himself, which militates against a conclusion that he was too severely mentally ill to waive the right to counsel. There is no requirement that a defendant "must possess a minimum level of legal acumen to be considered competent to effectively waive counsel." *McNutt*, 2020 IL App (1st) 173030, ¶ 96. In fact, "existing caselaw clearly holds that a lack of legal sophistication, knowledge, or experience—manifested in the form of unsupported legal theories, unsuccessful strategies, and unwise tactical decisions—is not a basis on which to find a defendant incompetent to waive counsel or his waiver of counsel ineffective." *McNutt*, 2020 IL App (1st) 173030, ¶ 96. If it were, it would be impossible for any nonlawyer defendant to exercise the right to self-representation. Ultimately,

> "[t]he fact that defendant lacked the legal knowledge and experience to make successful arguments and tactical decisions that were supported by existing law and the evidence in the case simply demonstrates what has been long known and repeated in the context of self-representation—the decision to represent oneself is not wise or prudent." *McNutt*, 2020 IL App (1st) 173030, ¶ 97.

¶ 60 Here, the trial court warned defendant multiple times that representing himself would be unwise and that he would not be held to a lower standard merely because he was not an attorney. Defendant chose to represent himself anyway and now must live with that decision. See *Allen*, 401 Ill. App. 3d at 854 ("Thus, defendant complains of a situation entirely of his own making. It is well settled that a defendant may not be heard to complain of errors that he injected into his own trial."). Defendant's inability to present a successful and consistent theory of defense does not rise to the level, in this case, of evidencing a concern that he suffered from a severe mental

illness that rendered him incompetent to waive his right to counsel and represent himself at trial. Given defendant's conduct and the court's superior ability to observe and assess defendant's behavior and interactions, we conclude that the court did not abuse its discretion in concluding that defendant was competent to waive counsel and knowingly, voluntarily, and intelligently did so.

¶ 61                                 III. CONCLUSION

¶ 62            For the reasons stated, we affirm the trial court's judgment.

¶ 63            Affirmed.